Bruno **MARTINO** and Eugenia Martino, Plaintiffs/Appellants,

v.

**SANTA CLARA VALLEY WATER DISTRICT, et al., Defendants/Appellees.**

No. 81–4578.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 14, 1982.

Decided April 14, 1983.

Joseph M. Gúghemetti, San Mateo, Cal., for plaintiffs-appellants.

Richard J. Wylie, Wylie, Blunt & McBride, San Jose, Cal., Marc G. Hynes, Sunnyvale, Cal., for defendants-appellees.

Before BROWNING, Chief Judge, PREGERSON, Circuit Judge, and SOLOMON,[*] District Judge.

PREGERSON, Circuit Judge:

Bruno and Eugenia Martino brought this action for damages against the Santa Clara Valley Water District ("Water District"), the City of Morgan Hill ("Morgan Hill") and the Water District's chief real estate agent, Donald A. Lawrie. The Martinos sought damages for inverse condemnation and for violations of the Federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1986, arising out of an alleged "taking" of their property without just compensation.

The district court granted defendants' motion for summary judgment against the Martinos on both claims. The court held that the Martinos' failure to submit a development plan upon which the Water District and Morgan Hill could act precluded the Martinos from proving an "invasion or appropriation" of their property rights and that the case was therefore not ripe for adjudication. The Martinos appealed.

Based on our belief that the Martinos' complaint alleged facts which, if true, could constitute a "taking" whether or not a development plan was submitted, we hold that summary judgment was inappropriate. Accordingly, we reverse and remand the matter for trial.

FACTS

The Martinos are the owners of approximately 4.4 acres of land in the City of

---

[*] Honorable Gus J. Solomon, Senior U.S. District Judge for the District of Oregon, sitting by designation.

Morgan Hill, Santa Clara County, California. The Martinos' land is located within a 66,400-acre area covered by the Llagas Creek Watershed Project Plan ("the Llagas Project"), a flood-control program begun in 1968. The Llagas Project has three basic objectives: (1) providing land-treatment measures to reduce erosion and sediment production within the watershed; (2) modifying 29.4 miles of the Llagas Creek and its major tributaries to increase their capacity and constructing levees to limit the flood-plain width along 2.8 miles of Llagas Creek; and (3) raising Chesbro Dam 11 feet. From the inception of the Llagas Project, part of the Martinos' land has been slated for eventual public acquisition by the Water District for channel excavation and construction of a waterway levee.

In March 1974, the Water District adopted Ordinance No. 74–1, which provides, in pertinent part:

> 7.2 Without having first secured a permit ... or other written approval from the [Water] District, it shall be unlawful after the effective date of this ordinance for any person, firm, corporation, ... or district to do or cause to be done any of the following:
>
> .    .    .    .    .
>
> B. Construct, place or maintain any structure or perform any grading upon a levee or on a District project.

In addition, Section 10 of the ordinance states:

> In order to permit the provision of flood control services by the District, the Engineer will request, wherever equitable and appropriate, that the city or the county having jurisdiction secure flood control dedications to the District from landowners seeking a change of land use.

In August 1975, the Martinos applied for subdivision of their land into three parcels. The Morgan Hill Planning Commission approved the application subject to the condition that the Martinos reserve or dedicate to the Water District a 96-foot-wide right

of way across their property. The Martinos appealed the Planning Commission determination to the Morgan Hill City Council. The City Council ordered that the dedication be reduced to 35 feet and that an additional 61 feet be reserved for eventual purchase by the Water District if needed. The Martinos subsequently conveyed the 35-foot easement to the Water District without compensation and leased one of the subdivided parcels for the construction of a Burger King restaurant.

In January 1980, Morgan Hill completed a "General Plan Policy Document," which provided, in part, that "[d]evelopment shall be prohibited within the floodway areas." Apparently in response to this declaration of policy, the Martinos wrote a letter to Lawrie, chief real estate agent for the Water District, dated July 3, 1980, inquiring (1) when the Water District intended to purchase or condemn the proposed right of way across the Martinos' property, and (2) what would be the effect, if any, on the right of way if the Martinos submitted a development plan for either or both of their remaining two parcels.

By letter dated July 18, 1980, Lawrie informed the Martinos that construction on the relevant portion of the Llagas Creek "probably would not occur prior to 1986" and that acquisition of the necessary rights of way "would normally occur in the preceding year, most likely 1985." Lawrie explained that the Llagas Project was then in a moratorium stage pending completion of an Environmental Impact Statement and that the target date for reauthorization of the Project was July 1, 1981. Lawrie further stated:

> The proposed right of way width is 180 feet,[1] as indicated on the attached drawing. Previously, an easement was granted to the District by you across a portion of the property. The right of way requirements would be the same, should you submit a development plan prior to project acquisition.

1. It was not apparent from the record why or when the proposed right of way was enlarged to a width of 180 feet.

The 180-foot right of way comprises, according to the Martinos, 1.12 acres, or one-third of the subject property.

On or about July 21, 1980, the Martinos wrote again to Lawrie requesting, among other things, more specific information regarding the likely effect of the proposed right of way on any development plan that the Martinos might later submit. Lawrie, by letter dated July 25, 1980, responded:

If you submit a development plan during the present restudy period and prior to the completion and approval of the Environmental Impact Statement, the District would request that the entire 180 feet of right of way be dedicated. Once we are assured that the Federal project is going to proceed, and if, subsequently to that time, a development plan is submitted, we would request that the land be reserved for future purchase.

In September 1980, the Martinos sought an informal opinion from Morgan Hill regarding the prospects of developing their property in light of the Water District's plans for public acquisition. Morgan Hill responded by letter dated September 16, 1980, that the Martinos "would have to meet all City and Water District requirements in order to have the project approved" and "go through the proper steps with engineering and archtectural [sic] consultants to prepare plans for the City and meet the City requirements and obtain the necessary approvals." It is undisputed that the Martinos never applied for a development permit and never attempted to sell the property.

The Martinos filed their complaint on October 24, 1980. They alleged that the acts of the Water District and Morgan Hill were intended to preclude all development and use of their property and to depress the value of their property pending public acquisition. According to the Martinos, their property "has been deprived of all of its reasonable beneficial economic uses and its economic return and marketability," thus resulting in a "taking" of the property without just compensation in September 1980. The Martinos also alleged that these

same acts, taken together with the acts of Lawrie as the Water District's agent, constituted a violation of the Federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1986.

Defendants moved for summary judgment on both claims, contending, in essence, (1) that the matter was not "ripe" for judicial intervention because the Martinos had not submitted a development plan upon which the Water District and/or Morgan Hill could take official action; (2) that the conduct alleged by the Martinos did not amount to a "taking"; and (3) that even if a "taking" had occurred, the Martinos' proper remedy was declaratory relief and not damages.

After oral argument, the district court tentatively denied the motion. Less than one week later, however, the court requested reargument on the question whether the opinions of the California Supreme Court and the U.S. Supreme Court in *Agins v. City of Tiburon,* 24 Cal.3d 266, 598 P.2d 25, 157 Cal.Rptr. 372 (1979), *aff'd,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), were dispositive of the instant case. At the conclusion of reargument on October 15, 1981, the court stated from the bench:

The California Supreme Court through Justice Richardson, and the Supreme Court of the United States through Justice Powell, have made it abundantly clear that simply relying on a general plan of the city, or the water district, is not sufficient to constitute inverse condemnation.

Both decisions make it clear—and counsel—able counsel who have read both of these decisions agree—that there must be an invasion.

Now the question as to whether or not there is an exception to this rule, I don't think . . . applies in this case.

In the first place, the cases that were relied upon actually involved takings. But, in any event, it doesn't seem to me that the case is now ripe for trial. And using the language of the court in Selby against the City of San Buenaventura: The adoption of a general plan is several

leagues short of a firm declaration of an intention to condemn property. In order to state a cause of action for inverse condemnation, there must be an invasion or appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specifically affect the landowner to his injury.

And in the case at bar, the landowner has made no application for approval of a specific form of development.

(Transcript of oral argument at 51–52.) The court then granted the motion for summary judgment.

STANDARD OF REVIEW

■ The district court's ruling may be affirmed only if it appears from the record, after viewing all evidence and factual inferences in the light most favorable to the Martinos, that there are no genuine issues of material fact and that the defendants are entitled to judgment as a matter of law. *E.g., Dosier v. Miami Valley Broadcasting Corp.,* 656 F.2d 1295, 1300 (9th Cir.1981). In an appeal from an order granting a motion for summary judgment, the *de novo* standard of review applies. *See, e.g., State ex rel. Edwards v. Heimann,* 633 F.2d 886, 888 n. 1 (9th Cir.1980).

ANALYSIS

1. *Submission of a Development Plan*

As set forth above, the district court purported to rely on the decisions in *Agins v. City of Tiburon,* 24 Cal.3d 266, 598 P.2d 25, 157 Cal.Rptr. 372 (1979), *aff'd,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), in concluding that the Martinos could show no "invasion" of their property rights. In *Agins,* landowners sought damages for inverse condemnation based on a zoning ordinance which permitted them to build no more than five single-family residences on their five-acre tract. As in the instant case, the landowners in *Agins* did not submit a development plan or apply for a permit to use or improve their property following the adoption of the zoning ordinance. In holding that the ordinance did not effect a "taking," the California Supreme Court stated:

[W]e hold that a zoning ordinance may be unconstitutional and subject to invalidation only when its effect is to deprive the landowner of substantially all reasonable use of his property. The ordinance before us had no such effect. . . . [T]he RPD–1 zoning allows plaintiffs to build between one and five residences on their property. This belies plaintiffs' claim that development of their land is forever prevented. Taking cognizance of the use which plaintiffs were entitled to make of their land the trial court was justified in finding that the ordinance did not unconstitutionally interfere with plaintiffs' entire use of the land or impermissibly decrease its value.

24 Cal.3d at 277, 598 P.2d at 31, 157 Cal. Rptr. at 378.

The U.S. Supreme Court also upheld the ordinance, stating:

The California Supreme Court has decided, as a matter of state law, that appellants may be permitted to build as many as five houses on their five acres of prime residential property. At this juncture, the appellants are free to pursue their reasonable investment expectations by submitting a development plan to local officials. Thus, it cannot be said that the impact of general land-use regulations has denied appellants the "justice and fairness" guaranteed by the Fifth and Fourteenth Amendments. See *Penn Central Transp. Co. v. New York City,* 438 U.S. [104], at 124 [98 S.Ct. 2646 at 2659, 57 L.Ed.2d 631].

447 U.S. at 262–63, 100 S.Ct. at 2142 (footnote omitted).

The district court apparently interpreted the decisions in *Agins* as holding that there could be no "invasion" of a landowner's property rights until a development plan had been passed upon by the local government agency. During oral argument on this point the court stated:

Well now, the California courts have held that there has to be an actual invasion of a property right; that San Buena-

ventura case ... and the two Supreme Court cases, say that—in that case, in the *Agins* case, the property owner was free to do whatever he wanted, until—and put up a plan. But the plan had to be approved by the Planning Board, or whatever it was; and that until the Planning Board acted there was nothing to stop him from doing anything.

(Transcript of oral argument at 45.)

■■■ We disagree with the court's interpretation of the *Agins* decisions. While both opinions are somewhat unclear on this point,[2] the California Supreme Court and the U.S. Supreme Court did not appear to rely heavily upon the fact that the landowners had not submitted a development plan; rather, that fact merely prevented the landowners from attacking the regula-

tion "as applied." The primary basis for rejecting the landowners' inverse condemnation claim was that the regulation "on its face" did not "deprive the landowner of substantially all reasonable use of his property," 24 Cal.3d at 277, 548 P.2d at 31, 157 Cal.Rptr. at 378, and did not "prevent the best use of appellants' land ... [or] extinguish a fundamental attribute of ownership," 447 U.S. at 262, 100 S.Ct. at 2142. In other words, the landowners in *Agins* had shown an "invasion" of their property rights, contrary to the interpretation of the district court, but not an "invasion" of sufficient magnitude to have "denied [the landowners] the 'justice and fairness' guaranteed by the Fifth and Fourteenth Amendments." *Id.* at 262–63, 100 S.Ct. at 2142.[3] We hold, therefore, that the failure

2. The district court may have been misled by the manner in which Justice Powell narrowed the issues before the Court:

The appellants' complaint framed the question as whether a zoning ordinance that prohibits all development of their land effects a taking under the Fifth and Fourteenth Amendments. The California Supreme Court rejected the appellants' characterization of the issue by holding, as a matter of state law, that the terms of the challenged ordinance allow the appellants to construct between one and five residences on their property. The court did not consider whether the zoning ordinance would be unconstitutional if applied to prevent appellants from building five homes. *Because the appellants have not submitted a plan for development of their property as the ordinances permit, there is as yet no concrete controversy regarding the application of the specific zoning provisions.* [Citations.] Thus, the only question properly before us is whether the mere enactment of the zoning ordinances constitutes a taking. *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (emphasis added).

Similarly, the Martinos do not claim only that the ordinance in question effected a "taking" *as applied* to a particular permit or variance application; they also contend that there was a "taking" by virtue of the *mere enactment* of Ordinance No. 74–1. As it did in *Agins,* this contention should supply the requisite "concrete controversy" without regard to whether a development plan was submitted.

In fact, the Martinos' failure to submit a development plan may not even bar their "as applied" claim that the actions and policies of the Water District and Morgan Hill in implementing the ordinance effected a "taking" of

their property. Although under *Agins* such a claim would ordinarily not be ripe until an actual development plan had been submitted and passed upon, the Martinos contend that submission of a plan should not be required when it would be an "idle and futile act." *See, e.g., Dahl v. City of Palo Alto,* 372 F.Supp. 647 (N.D.Cal.1974); *Ogo Ass'n v. City of Torrance,* 37 Cal.App.3d 830, 112 Cal.Rptr. 761 (1974). The district court did not reach this issue, apparently because it believed that the "idle and futile act" exception was inapplicable unless a "taking" could be proved or the case was otherwise ripe for trial. In light of our disposition, this issue should also be addressed on remand.

3. This reading of *Agins* is consistent with the recent case of *San Diego Gas & Elec. Co. v. City of San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981). In that case, the appellant sought damages for inverse condemnation after the City of San Diego had rezoned part of appellant's property and placed the entire property within an open-space designation. Although appellant had not submitted any plan for the development of its property, it alleged that "the city had deprived it of the entire beneficial use of the property through the rezoning and the adoption of the open-space plan." *Id.* at 626, 101 S.Ct. at 1290. The trial court concluded that there had been a "taking," and the California Court of Appeal affirmed, holding that "[a]ppellant's failure to present a plan for developing the property ... did not preclude an award of damages in its favor." *Id.* at 628, 101 S.Ct. at 1291.

The California Supreme Court granted the city's petition for a hearing and retransferred the case to the Court of Appeal for reconsideration in light of the *Agins* decision. The appel-

to submit a development plan is not, in and of itself, a bar to an attack on the ordinance "on its face." Because the Martinos' facial attack raises material issues of fact as to whether the mere enactment of the ordinance "prevent[ed] the best use of appellants' land ... [or] extinguish[ed] a fundamental attribute of ownership," *id.* at 262, 100 S.Ct. at 2142, we remand to the district court for a determination of those issues.

■ The Martinos also seek to recover on a second theory. A "taking" may be found without any physical invasion where, for example, "a public entity acting in furtherance of a public project directly and substantially interferes with property rights and thereby significantly impairs the value of property...." *Richmond Elks' Hall Association v. Richmond Redevelopment Agency,* 561 F.2d 1327, 1330 (9th Cir. 1977). This typically occurs when the public entity excessively delays condemnation proceedings after the property is slated for acquisition or otherwise acts unreasonably. *See id.* at 1330–31; *see also Foster v. City of Detroit,* 254 F.Supp. 655 (E.D.Mich.1966), *aff'd,* 405 F.2d 138 (6th Cir.1968) ("taking" found where city commenced condemnation proceedings and kept *lis pendens* in effect for five years after stop order was issued on project, then abandoned condemnation proceedings after ten years and commenced new proceedings). To the extent that the Martinos seek to prove that a "taking" occurred because of unreasonable delays or other unreasonable conduct in the condemnation process, their failure to submit a development plan is irrelevant.

■ This theory also raises material issues of fact which preclude summary judg-ment. Primarily, the court must determine on remand whether the Water District's and Morgan Hill's actions in implementing the Llagas Project, including the delay in commencing condemnation proceedings, were so unreasonable as to result in "planning blight" for which the Martinos may be entitled to compensation. *See id.* at 665–66.

**2. *Damages as Inverse Condemnation Remedy***

■ Defendants also argue that even if a "taking" had occurred, the California Supreme Court's decision in *Agins* provides an analytical basis for upholding the district court's order granting the motion for summary judgment on the Martinos' inverse condemnation claim. Although the district court apparently did not rely on this aspect of *Agins,* the California Supreme Court stated in extended dictum that landowners burdened by excessive governmental regulation could not recover damages for inverse condemnation:

> In combination, the need for preserving a degree of freedom in the land-use planning function, and the inhibiting financial force which inheres in the inverse condemnation remedy, persuade us that on balance mandamus or declaratory relief rather than inverse condemnation is the appropriate relief under the circumstances.

24 Cal.3d at 276–77, 598 P.2d at 31, 157 Cal.Rptr. at 378.[4] The Martinos do not seek either a writ of mandamus to compel action by the Water District or Morgan Hill or a declaration that Ordinance No. 74–1 is invalid. Thus, if we chose to follow the *Agins* dictum, we could affirm the order granting

late court thereupon reversed the judgment of the trial court in an unpublished opinion, holding that mandamus or declaratory relief—not inverse condemnation—was the proper remedy for "alleged overzealous use of the police power" by the city. The court stated that whether a "taking" had occurred to justify such relief involved "disputed fact issues not covered by the trial court in its findings and conclusions," including a finding of the extent to which appellant would have been permitted to develop its property by the city. *Id.* at 630, 632 & n. 12, 101 S.Ct. at 1292, 1294 & n. 12. The U.S. Supreme Court subsequently dismissed the appeal, holding that the appellate court's failure

to find whether a "taking" had occurred precluded review for lack of a final judgment. *Id.* at 633, 101 S.Ct. at 1294. At no time did any of these reviewing courts suggest that appellant's failure to submit a development plan to the city was fatal to its claim that the open-space plan "on its face" gave rise to a compensable "taking."

**4.** The court's pronouncement is dictum because, having held that there had been no "taking," the court did not need to decide what remedies were and were not appropriate had a "taking" actually occurred.

summary judgment on a different ground from that relied upon by the district court.

The present vitality of this aspect of *Agins* has, however, been substantially undercut by Justice Brennan's dissenting opinion in *San Diego Gas & Electric Co. v. City of San Diego,* 450 U.S. 621, 636–61, 101 S.Ct. 1287, 1296–1309, 67 L.Ed.2d 551 (1981), in which Justices Stewart, Marshall and Powell joined. In reaching the merits of the case after a majority of the Court had voted to dismiss the appeal for lack of a final judgment (*see* note 3, *supra*), Justice Brennan stated:

> The only constitutional requirement is that the landowner must be able meaningfully to challenge a regulation that allegedly effects a "taking," and recover just compensation if it does so.

*Id.* at 660, 101 S.Ct. at 1308. Justice Brennan rejected the California Supreme Court's justification of "various policy considerations" for its decision in *Agins,* stating that the applicability of constitutional guarantees does not hinge on legislative policy judgments, nor should the vindication of these guarantees depend upon the expense in doing so. *Id.* Accordingly, Justice Brennan proposed a constitutional rule requiring that, once a court finds that a regulation has resulted in a "taking," the government entity must pay just compensation for the period commencing on the date the regulation first effected the "taking" and continuing until the entity chose to rescind or otherwise amend the regulation. *Id.* at 658, 101 S.Ct. at 1307.

Justice Rehnquist, in a concurring opinion, stated:

> If I were satisfied that this appeal was from a "final judgment or decree" of the California Court of Appeal, as that term is used in 28 U.S.C. § 1257, I would have little difficulty in agreeing with much of what is said in the dissenting opinion of JUSTICE BRENNAN. Indeed, the Court's opinion notes "that the federal constitutional aspects of that issue are not to be cast aside lightly. . . ." *Ante,* at 633, 101 S.Ct. at 1294.

*Id.* at 633–34, 101 S.Ct. at 1294–95. Thus, a majority of the Court apparently is of the opinion—contrary to that of the California Supreme Court in *Agins*—that damages *are* recoverable for inverse condemnation.

■ Even if we were persuaded by the dictum in *Agins* to hold that the Martinos could not recover damages for inverse condemnation, summary judgment would be improper insofar as it relates to the Martinos' claim under the Federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1986. While "the contours of municipal liability under § 1983 . . . are currently in a state of evolving definition and uncertainty" (*see City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981)), an action for damages under section 1983 for the overregulation of land was recognized by the U.S. Supreme Court in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). The district court improperly denied the Martinos an opportunity to try to prove such a claim.

## SUMMARY

Based on the above analysis, the district court's order granting defendants' motion for summary judgment is reversed and the case remanded for trial.