892 F.2d 315
 Joan DOE, Mary Roe and Susan Loe, on their own behalf and on
behalf of all others similarly situated, Appellants,
v.
The CITY OF BUTLER, PENNSYLVANIA, and Richard J. Schontz,
Mayor of the City of Butler, Pennsylvania.
 No. 88-3691.
 United States Court of Appeals,
Third Circuit.
 Argued June 15, 1989.
Decided Dec. 29, 1989.
 
 Donald Driscoll (argued), Neighborhood Legal Services Ass'n., Pittsburgh, Pa., Jane F. Hepting, Neighborhood Legal Services Ass'n., Butler, Pa., for appellants.
 Thomas W. King, III (argued), Dillon, McCandless & King, Butler, Pa., for appellees.
 Gwilym A. Price, III, Butler, Pa., for amicus curiae, United Cerebral Palsy of Butler County, Transitional Living, Inc. and Ass'n. for Retarded Citizens of Butler County in support of appellants.
 Before SLOVITER and COWEN, Circuit Judges, and ROTH, District Judge*.
 OPINION OF THE COURT
 SLOVITER, Circuit Judge.
 
 
 1
 Plaintiffs, who seek to represent a class of battered women in need of temporary shelter in Butler County, Pennsylvania to escape infliction of domestic violence, filed a class action suit challenging on constitutional and statutory grounds Butler's zoning regulation which limits transitional dwellings to a total of six persons and a supervisory family or person. In their complaint, plaintiffs claimed, inter alia, that the six-person limit for transitional dwellings is a violation of the due process clause of the Fourteenth Amendment, associational rights protected by the First Amendment, and the Fair Housing Act, 42 U.S.C. §§ 3601-3631 (1982).
 
 
 2
 After a hearing on plaintiffs' motion for a preliminary injunction, the district court held that the six-person line drawn in the ordinance was not arbitrary, and rejected the constitutional and statutory arguments. The parties then filed cross-motions for summary judgment and the court entered summary judgment for defendants. Plaintiffs filed a timely notice of appeal. Our review over the entry of summary judgment is plenary.
 
 I.
 Facts and Procedural History
 
 3
 Plaintiffs are three battered women using fictitious names who filed suit in district court in the Western District of Pennsylvania after the defendants, the City of Butler, acting through the City Council, and the Mayor, refused to approve the application by the Volunteers Against Abuse Center of Butler County, Inc. (VAAC) seeking to use a building at 404 N. Washington Street, which it had contracted to buy, as a temporary shelter for abused women and children. VAAC's purchase was being funded in part by a $100,000 grant from the United States Department of Housing and Urban Development. The grant was tied to the specific location chosen by VAAC to establish its group home.
 
 
 4
 After a public hearing, the Planning and Zoning Commission recommended approval of the application for a conditional use, subject to the condition that a maximum of six individuals, exclusive of staff but including children, be housed at the shelter. The City Council rejected this recommendation and denied VAAC's application on the ground that VAAC "has not established that the proposed use is within the provisions of the Zoning Ordinance" limiting transitional dwellings to six residents, excluding staff or supervisory personnel referred to above. The Council identified as additional reasons for its disapproval of VAAC's application the adverse impact of the shelter on density, parking, property values, and on the neighborhood's character as single-family residential.
 
 
 5
 The district court held that "[r]egardless of the merits of the other reasons the Council proffered for rejecting the VAAC's application ... the Council had no choice but to deny the application as prohibited by the Ordinance's six person limit." App. at 9. The court concluded that the line drawn in the zoning ordinance in limiting transitional dwellings to six persons was not arbitrary.
 
 
 6
 The court recognized that the plaintiffs have been consistent in their insistence that a transitional dwelling for abused women which did not house twelve to fifteen women and children was economically unfeasible. It held, citing Village of Belle Terre v. Boraas, 416 U.S. 1, 4-5, 94 S.Ct. 1536, 1538-39, 39 L.Ed.2d 797 (1974), that because the wisdom of the line drawn is debatable, plaintiffs must fail. For the same reasons, the district court thereafter granted summary judgment against plaintiffs.
 
 II.
 The Zoning Ordinance
 
 7
 Butler's zoning ordinance creates four classes of residential districts, two classes of commercial districts, and two classes of industrial districts. See Butler, Pa., Codified Ordinances Part Thirteen, title three. The uses allowed in each class are divided into permitted uses, which are "expressly allowed to occur on a property", art. 1303.89, accessory uses, which are uses subordinate and incidental to the primary use of property, art. 1303.02, and conditional uses, the approval of which are subject to the discretion of the City Council, art. 1355. The approval of a conditional use can only come after the City Council has received a recommendation by the Planning and Zoning Commission, which has the authority to call a public hearing on the application. Art. 1355.02. The Planning and Zoning Commission, in deciding whether to recommend approval or disapproval of an application for a conditional use, shall consider if "[t]he use is of such location, size and character that in a general way it will be in harmony with the appearance and orderly development of the district in which it is situated, and not be detrimental to the orderly development of adjacent districts." Art. 1355.03(a).
 
 
 8
 Of most relevance in this appeal are the residential districts created by the ordinance. An R-1 low density residential district permits single-family detached dwellings as of right, art. 1325.01, and allows as conditional uses schools, libraries, public recreation facilities, churches, and certain local government buildings, art. 1325.03. An R-2 medium density district includes as permitted uses single and two-family dwellings, art. 1327.01, and allows as conditional uses those conditional uses permitted in an R-1 district as well as townhouses and certain neighborhood commercial activities, such as grocery stores, drug stores, banks, dry cleaning stores, bars and restaurants, art. 1327.03. An R-3 high density residential district adds as a permitted use multiple-dwelling buildings, art. 1329.01, and adds as conditional uses row houses and hospitals, art. 1329.03. Finally, an R-0 residential office district includes as permitted uses churches, libraries, offices and schools, art. 1331.01, and as conditional uses hotels and motels, art. 1331.03.
 
 
 9
 The parties agree that the group home VAAC sought to establish is representative of the type of temporary shelter for abused women which is the subject of the complaint, and is best classified as a "transitional dwelling" under the Butler zoning ordinance. The ordinance defines a transitional dwelling as "a building occupied for residential purposes by not more than six individuals being provided temporary special care plus supervisory family or individual. Such transitional dwellings may be operated for the benefit of foster-placed individuals, for those recovering from drug, alcoholic or other diseases or those unable because of mental or physical handicaps to care for themselves." Art. 1303.44. All four categories of residential districts classify a transitional dwelling as a conditional use.[1]
 
 III.
 Discussion
 A.
 The Due Process Claim
 
 10
 Before turning to the applicable legal principles it is important to try to focus on precisely what is before us. It is possible that the parties' lack of clarity on that score stems from the fact that the record in this case was made primarily in the context of a motion for a preliminary injunction directed to the authorization for the occupancy of the Washington Street house. It is evident from the complaint, however, that the plaintiffs' suit challenges more than the specific denial of the conditional use authorization for the occupancy of 404 Washington Street as a shelter for abused women and their children.
 
 
 11
 The other claim made in the complaint requests a permanent injunction enjoining the defendants "from enforcing those parts of its zoning provisions which: 1) Permit the denial of a group living facility where all legitimate zoning concerns have been satisfied; and 2) Arbitrarily limit the occupancy of group living facilities to six residents in need of care and support." Unlike the claim directed to the Washington Street house, which is located in an R-2 district, the latter claim is not limited to the R-2 medium density district. We must therefore consider whether, as a matter of law, summary judgment was proper not only with respect to the denial of conditional use authorization of the Washington Street House but also with respect to plaintiffs' broader challenge to the across-the-board occupancy limit of six residents.
 
 
 12
 It has long been clear that zoning legislation is entitled to deference and respect. As the Supreme Court declared in Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 388, 47 S.Ct. 114, 118, 71 L.Ed. 303 (1926), "[i]f the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control." See also Nectow v. City of Cambridge, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928) (zoning restrictions must be upheld if they "bear a substantial relation to the public health, safety, morals, or general welfare"). More concretely, we must uphold a zoning ordinance if the legislation is reasonable and not arbitrary and bears a rational relationship to a permissible state objective. See Schad v. Borough of Mount Ephraim, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981); Village of Belle Terre v. Boraas, 416 U.S. 1, 8, 94 S.Ct. 1536, 1540-41, 39 L.Ed.2d 797 (1974). Moreover, "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).
 
 
 13
 We must consider at the outset plaintiffs' argument that the ordinance should be reviewed under the heightened scrutiny appropriate when a government regulation affects a fundamental right. The district court rejected their argument on the ground that the ordinance is not aimed at a suspect or quasi-suspect class.
 
 
 14
 The fact that plaintiffs have chosen to establish a home for abused women does not mean that a neutral zoning provision applicable to that dwelling can be viewed as a sex-based regulation. Plaintiffs, however, argue that the ordinance has an adverse impact on families, because women in need of shelter often have small children who are counted as residents for purposes of the six-person limitation in transitional dwellings. This renders six-resident shelters for abused women economically unfeasible, and adversely affects the ability of abused women to keep their children with them while in shelter.
 
 
 15
 Moore v. City of East Cleveland, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), on which plaintiffs rely, is distinguishable because there the ordinance actually selected a certain category of relatives who may live together. Id. at 498-99, 97 S.Ct. at 1935. The Butler ordinance does not prohibit the children of abused women from residing with their mothers, and is facially neutral in this regard. It is the six-resident limit rather than any provision directed to family relationship which creates the effect plaintiffs challenge. Therefore we believe that for due process purposes this ordinance must be evaluated under the same reasonableness standard applicable to the vast majority of legislative judgments relating to zoning.
 
 
 16
 In arguing that the ordinance violates their substantive due process rights, plaintiffs place their principal reliance on the decision of the Supreme Court in City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In that case the Supreme Court invalidated on equal protection grounds[2] a provision in a zoning ordinance requiring special use permits for penal institutions and group homes for "the insane or feeble-minded, or alcoholic [sic] or drug addicts" when uses such as apartment houses, hospitals and nursing homes were automatically permitted in the same zone. Id. at 436, 105 S.Ct. at 3252. Although the Court refused to apply a heightened level of scrutiny, id. at 442-47, 105 S.Ct. at 3255-58, it nonetheless found that the provision was not rationally related to a legitimate governmental purpose.
 
 
 17
 The defect present in the ordinance considered in Cleburne is not presented in the Butler zoning ordinance. In Cleburne, the vice was that a group home for the mentally retarded required a special use permit while other care and multiple-dwelling facilities were freely permitted. Id. at 447-48, 105 S.Ct. at 3258-59. The Court stated that the city's alleged concerns about avoiding population concentration and lessening congestion of the streets "obviously fail to explain why apartment houses, fraternity and sorority houses, hospitals and the like, may freely locate in the area without a permit." Id. at 450, 105 S.Ct. at 3260. In contrast, the Butler ordinance, at least with respect to an R-2 district, does not exhibit the fatal inconsistency of the Cleburne ordinance. All transitional dwellings as well as dwellings for unrelated people are limited to no more than six residents.[3] Thus, Cleburne does not provide plaintiffs much assistance.
 
 
 18
 The City of Butler defends the six-person limitation on transitional dwellings on the City Council's goal to regulate density. Appellees' brief at 9. The minutes of the public hearing conducted by the City Council at which the six-person limit for transitional dwellings was considered identify no other reasons for the limitation. App. at 29-30. The City's expert witness at the preliminary injunction hearing testified that the problems associated with a group home with a large number of residents were density-related: parking congestion, overcrowding on the premises themselves, increased traffic, and in general greater "comings and goings." App. at 151. Finally, at oral argument counsel for the City acknowledged that concerns about density were the only reasons offered by the City for the provision at issue.
 
 
 19
 In support of its argument that density is a matter of legitimate governmental concern, the City points to the Supreme Court's opinion in Belle Terre, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974). There the Court upheld a zoning ordinance which prohibited more than two persons unrelated by blood, marriage or adoption from living together in a district devoted solely to single-family dwellings. The Court based its decision on the fact that "[a] quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs." Id. at 9, 94 S.Ct. at 1541. Because a community could legitimately hold such objectives, it was not arbitrary or unreasonable to permit only two unrelated persons to live together. At some point increasing numbers of unrelated individuals living together would disrupt the family environment intended to be fostered through the zoning ordinance. See id. The Court held that the city could choose to draw the line at two because "every line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial function." Id. at 8, 94 S.Ct. at 1540. See also Macon Ass'n for Retarded Citizens v. Macon-Bibb, 252 Ga. 484, 314 S.E.2d 218 (ordinance that limited dwelling units to those occupied by a single family or four unrelated persons survived equal protection challenge), appeal dismissed, 469 U.S. 802, 105 S.Ct. 57, 83 L.Ed.2d 8 (1984).
 
 
 20
 Appellants stress that the Washington Street house was situated in an R-2 medium density district. They attempt to limit Belle Terre to zoning regulations affecting a single-family district. We see no reason to give the opinion such a restrictive reading.
 
 
 21
 In Belle Terre, the Court not only referred to the single-family character of the district, but it made the point that the land use restriction also excluded lodging houses, boarding houses, fraternity houses, and multiple-dwelling houses. Id. at 2, 94 S.Ct. at 1537-38. It noted that in Euclid, where a zoning classification was upheld, "[t]he main thrust of the case in the mind of the Court was in the exclusion of industries and apartments." Id. at 5, 94 S.Ct. at 1539.
 
 
 22
 Although two-family dwellings are permitted in Butler's R-2 districts, density in such districts is an obvious concern to the City Council. For example, the ordinance does not permit multiple-dwelling buildings in R-2 districts and even rowhouses are only permitted as conditional uses. We see no reason why a community's right to impose certain non-arbitrary density restrictions should be limited to single-family districts. The municipality has a legitimate interest in fostering the desired environment by excluding incompatible uses in medium as well as low density districts. We decline to limit its power "to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people," id. at 9, 94 S.Ct. at 1541, to only districts where the residents can afford single-family homes.
 
 
 23
 We note that the City has not excluded all transitional dwellings from being located in R-2 districts. Indeed, the ordinance does not even restrict the number of transitional dwellings that can be situated in any given area, nor does it specify a minimum distance required between two transitional dwellings. App. at 147. Instead, the zoning ordinance accepts the placement of transitional dwellings throughout an R-2 district, but merely seeks to control the density of population that will result by limiting the number of occupants in each such transitional dwelling.
 
 
 24
 Appellants do not, and indeed could not, deny that density control is an appropriate City goal. In response, they make two arguments. The first is to argue that density is controllable through other means, such as through occupancy limits set forth in a building code or lot size and lot ratio requirements. As long as the municipality does not act arbitrarily and seeks to achieve a legitimate goal, we know of no constitutional principle that circumscribes a municipality by requiring it to use one rather than another type of zoning or building regulation. In any event, Belle Terre's holding sustaining the restriction on occupancy by unrelated residents is sufficient precedent for the reasonableness of restricting density via an occupancy limit contained in a zoning regulation.
 
 
 25
 Appellants' second argument is that the limit on the number of residents in a transitional dwelling should not be viewed as related to density control because there is no limit on the number of related persons who can live together. That argument, although superficially attractive, also must fail. Zoning restrictions cannot be applied to hinder those in a familial relationship from living together. In Moore v. City of East Cleveland Ohio, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), the Court held that the sanctity of the family was not limited to the nuclear family and that a zoning ordinance which precluded defining a family to encompass a child living with his grandmother was arbitrary. It distinguished the Belle Terre ordinance on the ground it "affected only unrelated individuals." Id. at 498, 97 S.Ct. at 1935 (emphasis in original).
 
 
 26
 It follows that the City of Butler, no matter how valid its density concerns, could not constitutionally limit the number of related persons living together. If the absence of an occupancy limitation on the members of a family who can live together is bootstrapped into the argument that therefore there can be no occupancy limitation for unrelated persons living together, there could never be such an occupancy limitation and Belle Terre would be meaningless. We cannot accept such a result.
 
 
 27
 We conclude that under the deferential rational basis standard, the six-person limit for transitional dwellings in R-2 districts as applied to the Washington Street house was not arbitrary because it was rationally related to the legitimate government objective of controlling density in a residential neighborhood.
 
 
 28
 This is not to say that we have no effective review as long as zoning legislation does not interfere with a fundamental right that warrants stricter scrutiny. "[A]n ordinance may fail even under [a] limited standard of review." Schad v. Borough of Mount Ephraim, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981). See also Moore v. City of East Cleveland, 431 U.S. 494, 514, 97 S.Ct. 1932, 1943 (Stevens, J., concurring) ("the broad zoning power must be exercised within constitutional limits"). With this in mind, we turn to plaintiffs' second claim.
 
 
 29
 As noted before, plaintiffs in their brief as well as their complaint also challenge the zoning ordinance's imposition of a six-person limit on transitional dwellings in R-3 and R-0 districts. At oral argument, counsel for Butler did not dispute that the six-person occupancy limit for transitional dwellings is fully applicable to residential districts other than R-2. In contrast to the R-2 districts, R-3 and R-0 districts allow, either as a permitted or a conditional use, uses which can markedly increase population density. For example, a multiple-dwelling building, which is permitted in an R-3 district without special approval, may contain three or more dwelling units for occupancy by three or more families living independently of each other. Art. 1303.43. Permitted as a conditional use in R-3 are hospitals which not only may be densely populated but may also invariably lead to substantial traffic by employees and visitors alike. An R-0 district permits uses that would cumulatively increase density. In view of the uses permitted in the other residential districts, the limitation of transitional dwellings to six persons in R-3 and R-0 districts may suffer from the same inconsistency that was found fatal in Cleburne.
 
 
 30
 The district court did not specifically discuss whether there was a rational basis for such an occupancy limit for transitional dwellings across the board. It failed to consider whether, in residential districts other than R-2, the challenged restriction's "relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." Cleburne, 473 U.S. at 446, 105 S.Ct. at 3257-58. See also Sullivan v. City of Pittsburgh, 811 F.2d 171, 184-85 (3d Cir.), cert. denied, 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987).
 
 
 31
 We will remand so that the court can consider the effect of the zoning ordinance's allowance of apartment buildings and other uses in R-3 and R-0 districts on the City's argument that a six-person limit is a reasonable means to limit density and its related problems. The court will be free, of course, to request the parties to develop a fuller record on this issue than was developed at the preliminary injunction hearing.
 
 
 32
 The dissent argues that remand is unnecessary because plaintiffs have not been successful in their "as applied" challenge, and it therefore follows that they cannot succeed in their facial challenge. Plaintiffs, however, were not unsuccessful in their challenge to the transitional dwelling provision with respect to the R-3 and R-0 districts because the district court never considered that issue. A remand is necessary for that purpose.
 
 
 33
 The dissent next argues that plaintiffs' challenge to the R-3 and R-0 provisions will not be ripe until there has been an application for a permit for a transitional dwelling in an R-3 or R-0 district which has been rejected. In light of the fact that the zoning ordinance applicable to the R-3 and R-0 districts flatly prohibits transitional dwellings for more than six persons, it appears that any site-specific application in those districts would be as futile as it was in the R-2 district. No prospective operator of a transitional dwelling is likely to spend the time, effort and expense required to initiate a project which is patently barred by the ordinance. Thus, under the dissent's analysis, there would be no realistic opportunity to have the issue decided.
 
 
 34
 We note that the ripeness issue was raised sua sponte by the dissent, and was not asserted by the City of Butler. It may be that ripeness was not argued by Butler because the language of the ordinance does not permit any deviation from the resident limitations imposed on transitional dwellings.
 
 
 35
 In any event, because the district court has apparently never considered plaintiffs' challenge to the provisions regarding transitional dwellings in the R-3 and R-0 districts, it has never had the opportunity to consider the creative approach suggested by the dissent regarding possible uses of multiple dwellings under the Butler ordinance. It may be that on remand the parties can agree on an interpretation that will accommodate plaintiffs' needs and the language of the ordinance. We do not foreclose a decision by the district court that the challenge as to the R-3 and R-0 districts is not ripe, but we are not prepared on appeal to pretermit an inquiry into an issue never treated by the district court.
 
 B.
 The First Amendment Claim
 
 36
 As an argument separate from their due process claim, plaintiffs contend that the six-resident limitation for transitional dwellings in Butler's zoning ordinance violates their right to freedom of association as guaranteed by the First Amendment, and should therefore be subjected to a more piercing review than we have given it.[4] They contend that because it is not programmatically or economically feasible to operate a shelter for abused women and their children if it is restricted to a total of six residents, the residency limit adversely affects their right to live in a dwelling with other battered women through which they could get sustenance from each other and counseling for all.
 
 
 37
 The right to association, as enunciated in Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), does not reach as far as plaintiffs suggest. The Court in Roberts referred to two distinct prongs of the freedom of association right. One prong encompasses the right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion. See, e.g., Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). That is not implicated here. The other prong recognizes choices by the individual "to enter into and maintain certain intimate human relationships." Roberts, 468 U.S. at 617, 104 S.Ct. at 3249.
 
 
 38
 The zoning occupancy limitation challenged here does nothing to prevent plaintiffs from associating with each other, and with others similarly situated. It merely provides that for zoning purposes, a reasonable occupancy limit must be observed. Nothing in Roberts suggests that the Court's prior opinion in Belle Terre, which explicitly rejected a right of association claim in a zoning context, see 416 U.S. at 7, 94 S.Ct. at 1540, is no longer governing authority. We must, therefore, reject plaintiffs' freedom of association claim.
 
 C.
 The Fair Housing Act Claim
 
 39
 We turn to plaintiffs' final contention that the Butler Zoning ordinance is invalid, this time because it violates the Fair Housing Act (Title VIII), 42 U.S.C. §§ 3601-3631 (1982), which prohibits certain specified discrimination in housing. To make out a prima facie case under Title VIII, a plaintiff can show either discriminatory treatment, see Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032 (2d Cir.1979), or discriminatory effect alone, without proof of discriminatory intent, see Resident Advisory Board v. Rizzo, 564 F.2d 126, 148 (3rd Cir.1977), cert. denied, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). In this case, plaintiffs allege that the zoning ordinance has a discriminatory effect on protected groups.
 
 
 40
 At the time the district court ruled, the relevant provision of Title VIII prohibited "mak[ing] unavailable ... a dwelling to any person because of ... sex," 42 U.S.C. § 3604(a) (1982), and the district court limited its discussion to gender discrimination. The court held that plaintiffs had not demonstrated a violation of the Act because the ordinance is facially neutral and applies to all transitional dwellings, regardless of whether their intended occupants are male or female. The court also held that plaintiffs had not proven their disparate impact claim, because they failed to show that its application has fallen more harshly on women than on men.
 
 
 41
 We agree that the fact that the ordinance will have an impact on group homes established for abused women does not alone establish discriminatory effect, because the resident limitation would have a comparable effect on males if the transitional dwelling was established for a different group, such as, for example, recovering male alcoholics. On the basis of the record established, we cannot conclude that the district court erred in rejecting the Title VIII challenge made on the basis of sex discrimination.
 
 
 42
 The 1988 amendments to Title VIII added a provision making Title VIII applicable to "familial status" as well as race, color, religion, sex or national origin. 42 U.S.C.A. § 3604(a) (West.Supp.1989). Familial status is defined under the Act to include "one or more individuals (who have not attained the age of 18 years) being domiciled with--(1) a parent or another person having legal custody of such individual or individuals...." 42 U.S.C.A. § 3602(k) (West.Supp.1989). Although this amendment was not in force at the time the district court ruled, "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Bradley v. School Bd. of Richmond, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974).
 
 
 43
 Plaintiffs argue that the across-the-board restriction on the number of residents who may occupy a transitional dwelling operates to limit or exclude women with children in violation of the familial status provision of Title VIII. Although the dissent argues that the legislative history indicates that the Act is designed to protect the individual family unit, we are not prepared to rule in the first instance that the Act is inapplicable to plaintiffs' situation. The dissent's statutory interpretation is plausible, but it fails to answer plaintiffs' argument, supported by the testimony, that it is not economically feasible to have a transitional dwelling for abused women limited to six residents. If children are counted for that purpose, it will, plaintiffs claim, violate amended Title VIII by adversely affecting the ability of abused mothers to bring their children with them when seeking refuge. We cannot discount the possibility that the six-person limit may in fact have a general dampening effect on the ability of women with children to take advantage of transitional dwellings.
 
 
 44
 We do not have a full record before us on this question, and are reluctant to decide this issue on this record. The parties have not cited any case on point nor have we found one. However, further inquiry into the legislative history, which the parties have not fully addressed on appeal, may offer some insight into the congressional view of the scope of the familial status provisions in the context presented here.[5] The district court may wish to invite HUD, which is the administrative agency responsible for enforcement of Title VIII, to present its views as an amicus. We will therefore remand to the district court so that it can decide, in the first instance, whether the across-the-board limit on the number of residents in a transitional dwelling violates Title VIII as amended.
 
 IV.
 Conclusion
 
 45
 In summary, we will affirm that portion of the district court's order granting summary judgment to defendants on plaintiffs' claim that the transitional dwelling provision in the Butler zoning ordinance violates due process with respect to R-2 districts, but we will remand for fuller consideration with respect to its application in R-3 and R-0 districts. We will affirm the court's rejection of the freedom of association claim. We will also affirm the grant of summary judgment on plaintiffs' challenge to the zoning ordinance based on that portion of the Fair Housing Act which prohibits discrimination on the basis of sex, but we will remand for consideration of plaintiffs' challenge on the basis of familial status.
 
 
 46
 For the reasons set forth above, we will vacate the district court's order granting summary judgment with respect to the claims on which we are remanding. Costs on appeal are to be divided equally between the plaintiffs and the defendants.
 
 
 47
 ROTH, District Judge, dissenting.
 
 
 48
 Although I agree with the well reasoned conclusion of the majority that the transitional dwelling provisions of the City of Butler zoning ordinance do not violate plaintiffs' due process rights with respect to R-2 districts, that they do not violate plaintiffs' right to freedom of association, and that they do not violate the sex discrimination prohibition of The Fair Housing Act, I must respectfully dissent from the majority's conclusion that the case be remanded to the District Court for fuller consideration of the consequences of the transitional dwelling provisions' application to R-3 and R-0 districts and of the effect of the "familial status" provision of The Fair Housing Act upon the transitional dwelling six-person limit.
 
 
 49
 Turning first to the validity of the transitional dwelling provisions as applied in R-3 and R-0 districts, I am aware that in the court below plaintiffs claimed both that the specific denial of the permit for a group home in an R-2 district was improper and also that the across-the-board transitional dwelling occupancy limit of six residents was arbitrary and must fail. This in effect was both an "as applied" and a "facial" attack on the transitional dwelling provisions. The "facial" attack is based on the conflict which exists between the six person limit[1] for transitional dwellings under the Butler Zoning Code and the plaintiffs' position, based on expert testimony, that a group home for battered women and their children is not economically feasible if it cannot accomodate 12 to 15 residents. Plaintiffs' "as applied" attack of the denial of the permit in an R-2 district was directed at the same six-person limit. It did not succeed in the court below due to the determination of the court that the permit to use a house at 404 Washington Street was denied to the Volunteers Against Abuse Center ("VAAC") through an evenhanded application of a facially neutral ordinance. Because the proceedings in the court below involved primarily a preliminary injunction hearing to force the City of Butler to grant a permit to VAAC in order to establish a shelter for battered women and their children at the Washington Street address, the focus of the opinion of the court below was on the denial of the permit for the 404 Washington Street site. On the appeal to this court, the majority have first considered that aspect of the plaintiffs' complaint and concluded that the denial of the permit in this R-2 district was proper: "[U]nder the deferential rational basis standard, the six-person limit for transitional dwellings in R-2 districts as applied to the Washington Street house was not arbitrary because it was rationally related to the legitimate government objective of controlling density in a residential neighborhood."
 
 
 50
 I disagree with the majority's further conclusion to remand for consideration of the effect of the six-person limit in R-3 and R-0 districts because I believe that once the majority has thus validated the transitional dwelling provisions in the specific location for which the permit was requested, the majority cannot then proceed to examine the ordinance on its face, without regard to any specific site application, in order to determine whether its language is so arbitrary that the six-person limit cannot be rationally related to a legitimate government objective. My primary reason for this position is that the standard for a successful facial challenge of a statute or ordinance is more difficult to achieve than that required for an attack of a specific application of that statute or ordinance.
 
 
 51
 A facial challenge to a legislative Act is, of course, the most difficult to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.
 
 
 52
 U.S. v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). Cf. Agins v. Tiburon, 447 U.S. 255, 260-63, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (discussion of "facial" vs "as applied" attacks on zoning ordinances limiting development potential of land); Martino v. Santa Clara Valley Water Dist., 703 F.2d 1141, 1146-47 (9th Cir.1983) (same); Zilber v. Moraga, 692 F.Supp. 1195, 1200-01 (N.D.Cal.1988) (same).
 
 
 53
 The distinction between facial and "as applied" attacks on governmental regulation permeates constitutional law, but it is especially important in cases challenging the constitutionality of land use regulations. A law is "facially" unconstitutional if a court can determine its invalidity simply by reading its terms. The court need not know what the effect of the law as administered has been.... A law is unconstitutional "as applied" if the court cannot determine its invalidity simply by reading its terms but must consider the manner in which it has been administered.
 
 
 54
 D. Mandelker, J. Gerard, E. Sullivan, Federal Land Use Law § 1.04 at 1-10.
 
 
 55
 Because the plaintiffs have failed to meet the less stringent burden of an "as applied" challenge to the transitional dwelling six-person limit, it is not appropriate to remand the case to determine if plaintiffs can now succeed in a more difficult facial attack. Or to paraphrase Salerno, having found a circumstance under which the ordinance is valid, plaintiffs cannot now succeed in establishing that under no circumstances could it be valid. I consider this principle to be sound whether one is considering the ordinance as a whole or merely various of its sections under which no permit application has in fact been made.
 
 
 56
 My other reason for opposing the remand to consider the application of the six-person limit to an R-3 or R-0 district is based upon a closely related concept: my conclusion that plaintiffs' challenge of the limit in these two districts is not ripe.
 
 
 57
 In the area of land use, the doctrine of ripeness is intended to avoid premature adjudication or review of administrative action.
 
 
 58
 Herrington v. County of Sonoma, 857 F.2d 567, 568 (9th Cir.1988) (also holding that these same ripeness standards apply to equal protection and substantive due process claims in land use cases).
 
 
 59
 No application has been made for a transitional dwelling permit for a group home for battered women and their children in an R-3 or R-0 district. I note that R-3 and R-0 districts, unlike R-2, allow "multiple-dwelling" buildings. Arts. 1329 & 1331. Thus, an application for a permit to establish a 12 to 15 person group home for battered women in two or more "dwellings" in a multiple dwelling building in an R-3 or R-0 district might in fact be granted. The Butler Zoning Code could be interpreted to permit this. For this reason, it is my conclusion that as to a specific zoning district, be it R-3 or R-0 or another, until application for a permit has been denied, a complaint regarding the transitional occupant limitations applicable to that district is not ripe.
 
 
 60
 My second area of disagreement with the majority is the decision to remand to the District Court for fuller consideration of whether the across-the-board six-person limit violates the "familial status" provision of The Fair Housing Act. In view of what appears to me to be the very clear language of this addition to the statute, I do not see the need for the court below to explore it further.
 
 
 61
 Section 3604(a) of The Fair Housing Act was amended in 1988 to prohibit discrimination in housing based on "familial status." See Fair Housing Amendments Act of 1988, Pub.L. No. 100-430, 102 Stat. 1620 (Sept. 13, 1988) ("the 1988 amendment"). "Familial status" is defined in the 1988 amendment as:
 
 
 62
 [O]ne or more individuals (who have not attained the age of 18 years) being domiciled with--(1) a parent or another person having legal custody of such individual....
 
 
 63
 42 U.S.C.A. § 3602(k) (West Supp.1989). On its face this definition does not encompass groups of more than one family such as would live at the Washington Street home.
 
 
 64
 The legislative history of the 1988 amendment supports this conclusion. When Congress referred to "familial status," it was concerned with the plight of single families, not with the plight of families who desired to live communally:
 
 
 65
 Familial status. The Committee intends to cover by this definition a parent or other person having legal custody, or that individual's designee, domiciled with a child or other children under age 18. The committee does not intend this definition to include marital status.
 
 
 66
 H.Rep. No. 100-711, 100th Cong., 2d Sess. 23, reprinted in 1988 U.S.Code Cong. & Admin.News 2173, 2184.
 
 
 67
 There is nothing in the language of The Fair Housing Act or the legislative history, to support the proposition that the Act is intended to extend protection to families who wish to live in groups. I find no need for the court below to explore this issue more fully.[2]
 
 
 68
 Moreover, if one considers the Butler six-person limit in connection with a single family unit, it does not seem likely that many single family units, particularly a family unit without the presence of the battering husband/father, will exceed the six-person limit. The Butler ordinance is not likely to collide with "familial status" provision insofar as the six-person limit applies to a single family unit. This is an additional reason for which I see no need for further consideration of the effects of The Fair Housing Act by the court below.
 
 
 69
 Because, therefore, I do not agree with either ground of the majority's decision to remand, I would affirm the district court's order, granting summary judgment to defendants.
 
 
 
 *
 Hon. Jane R. Roth, United States District Court for the District of Delaware, sitting by designation
 
 
 [1]
 The City argues that a group home could be established in a C-2 district under the guise of a boarding house. This argument fails to meet plaintiffs' contention that a group home for abused women and children shares the characteristics of a residence and hence should be most appropriately located in a residential district
 
 
 [2]
 The Supreme Court has described the standards for equal protection and due process challenges in the same terms. Compare Cleburne, 473 U.S. at 446, 105 S.Ct. at 3258 ("rationally related to a legitimate governmental purpose"), with Belle Terre, 416 U.S. at 8, 94 S.Ct. at 1540 ("reasonable, not arbitrary ... and bears a rational relationship to a permissible state objective") (citations omitted). This court has noted that, "[u]nlike equal protection ... the focus of due process analysis is not whether the Township has irrationally distinguished between similarly situated classes, but whether it was irrational for the Township to have passed the law at all and to have applied it to [plaintiff]." Rogin v. Bensalem Township, 616 F.2d 680, 689 (3d Cir.1980). Although the inquiry may be different, the concept of rationality, which is the central issue before us, remains the same and we therefore may look to equal protection cases for guidance
 
 
 [3]
 Under the Butler ordinance, two-family dwellings are permitted as of right in R-2 districts. Art. 1327.01. No more than three unrelated persons can constitute a family, art. 1303.50, thereby bringing to six the maximum number of unrelated persons who can reside in these dwellings. There are no other provisions in the ordinance which permit, either as of right or as a conditional use, more than six unrelated persons to occupy a residential dwelling in an R-2 district
 
 
 [4]
 To the extent plaintiffs' argument parallels their contention that the ordinance affects their fundamental right in maintaining family relationships, we reject it for the reasons set forth in the preceding section
 
 
 [5]
 We note that the amendments added a section specifically providing, "[n]othing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling." 42 U.S.C.A. § 3607(b)(1) (West Supp.1989). The district court should consider the effect of this statutory provision, as well as HUD's comments on the amendments that "in appropriate circumstances, owners and managers may develop and implement reasonable occupancy requirements based on factors such as the number and size of sleeping areas or bedrooms and the overall size of the dwelling unit." 54 Fed.Reg. 3232, 3237 (1989). We intimate no opinion as to whether the HUD comment is applicable to zoning ordinances, as distinguished from "owners and managers"
 
 
 [1]
 Butler Zoning Code, Art. 1303.44, provides that a "transitional dwelling may be occupied by "not more than six individuals being provided temporary special care, plus supervisory family or individual."
 
 
 [2]
 Because I find it clear that the "familial status" provision is not directed at "communities" of families, I will not go on to consider whether the six-person limit is exempted from The Fair Housing Act under § 3607(b)(1):
 Nothing in this title limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling.