**BANNUM, INC., Plaintiff–Appellee,**

v.

**CITY OF LOUISVILLE, KENTUCKY, Defendant–Appellant.**

No. 90–6371.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 4, 1991.

Decided March 23, 1992.

Rehearing En Banc Denied May 12, 1992.

Scott T. Wendelsdorf (argued and briefed), Ogden, Sturgill & Welch, Louisville, Ky., for plaintiff-appellee.

James H. Highfield, Asst. Director of Law, J. Michael Brown, Scott R. Cox (briefed), Donald L. Cox (argued and briefed), Lynch, Cox, Gilman & Mahan, Louisville, Ky., for defendant-appellant.

* Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

Before: JONES and NELSON, Circuit Judges; and JOINER, Senior District Judge.*

JOINER, Senior District Judge.

The City of Louisville appeals the bench ruling for Bannum, Inc., in this action, brought pursuant to 42, U.S.C. § 1983,[1] on the ground that the district court misapplied *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

Bannum owns and operates community training centers (CTCs) under contract with the United States Bureau of Prisons (Bureau). The Bureau solicited bids from Bannum and other companies for its CTC operation in Louisville in 1985 and again in 1988. In 1985, Bannum's bid was accepted and Bannum entered into a contract with the Bureau to operate a CTC in Louisville. In 1986, the contract was rescinded by the Bureau in response to Bannum's inability to demonstrate that its proposed CTC property was in compliance with Louisville's zoning ordinance.

Litigation ensued between the parties in state and federal court. In the case at bar, the district court found that Louisville's zoning ordinance deprived Bannum of its rights under the Equal Protection Clause of the Fourteenth Amendment in that CTC operators were required to apply for a "discretionary special use permit," while operators of similar group residential uses faced no such application requirement. A careful reading of *City of Cleburne* leads this court to conclude that the trial court did not clearly err in finding a provision of Louisville's zoning ordinance constitutionally invalid as applied to Bannum, and in granting injunctive relief and damages. Accordingly, we affirm the district court.

I.

The dispute between Louisville and Bannum has now been the subject of three

1. Bannum also sought a declaratory judgment and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

lawsuits: *Bannum I, Bannum II,* and *Bannum III.*

The CTC program, intended to facilitate the reintegration of federal offenders into society, began in Louisville in 1967, and was run continuously until 1985 by Dismas House of Kentucky. In 1985 the Bureau solicited bids from CTC operators, including Bannum, for the Louisville CTC program. Bannum conducted its seven-state CTC operation from its offices located on Clay Street in Louisville, in an area known as Butchertown. Prior to 1985, Bannum leased property located on East Washington Street in Louisville. These properties comprised three housing units; a duplex and a single family residence. Bannum submitted a bid to the Bureau for operation of a CTC at the East Washington Street location, and also informed the Bureau of the possibility of using the Clay Street location as a CTC. Both of these properties were located in zoning districts designated "M–2 Industrial" under the zoning regulations in effect in 1985. In October 1985, the Bureau accepted Bannum's bid and awarded it the Louisville contract.

The contract required Bannum to demonstrate that the proposed CTC facility site was in compliance with all applicable local zoning regulations. In order to comply, Bannum sought a "certificate of occupancy" and zoning approval as a "boarding house" from the city. This request was made after Bannum obtained confirmation from city officials that boarding houses were permitted to operate under the zoning regulations in a number of zoning districts without obtaining a special use permit.[2]

When Bannum's intention to operate a CTC at the East Washington Street location became known, neighborhood opposition developed. City officials indicated to concerned residents in the Butchertown area that they too opposed the CTC operation. In November 1985, Louisville filed an action in the Jefferson County Circuit Court (*Bannum I*) seeking a restraining order against Bannum based upon a restrictive covenant in the deed to Bannum's East Washington Street property. The deed limited the use of the property to a "three-unit dwelling house." The city complained that the zoning regulations defined dwelling houses as units "defined for or occupied by one family," and therefore to use the property to house 24 prisoners would violate the regulations. As relief, the city sought to enjoin Bannum from operating a CTC at the East Washington Street location, and to prevent application for a special use permit to operate a CTC in Louisville under the distinct zoning classification of an "institution," or "any other classification." The Jefferson County Circuit Court granted the city a temporary injunction, but denied its request for an order prohibiting Bannum from applying for a special use permit to operate a CTC under zoning classifications other than a "boarding house." Bannum's motion for *ex parte* intermediate relief, filed in the Kentucky Court of Appeals, was also denied.

Bannum next submitted affidavits to the Jefferson County Planning Commission and Board of Zoning Adjustments in order to establish a non-conforming use of the East Washington Street property. Bannum was informed by the city's attorney that a CTC was properly categorized under the zoning regulations as "institutional" use (the term "institution" was not defined by the zoning regulations in effect in 1985) and that operation of a CTC, whether in a M–2 Industrial district, or any other district in Louisville, could only be accomplished by obtaining a special use permit.

A special use permit is obtained through a multi-step procedure: (1) an applicant must attend a pre-application conference; (2) file a formal application with the Board of Zoning Adjustment; (3) a public hearing must take place; and (4) the issuance of a final decision by the Board. Only the final

---

**2.** The district court admitted the positive response of Mary Jent, assistant chief zoning officer, to a letter from Bannum's attorney requesting confirmation that boarding houses were permitted to operate without application for a special use permit in the following zoning districts: R–7, R–7A, R–8, R–9, R–10 (Apartment Districts), C–1, C–2, C–3, C–4 (Commercial Districts), C–5 (Professional Office District), and M–P–2A (Industrial Park District).

decision is appealable to the Kentucky Court of Appeals.

Bannum was aware of the considerable public opposition to its planned operation and chose not to apply for a special use permit. Rather, it sought to have the provision of the zoning regulation, which required institutional uses to apply for a special use permit, declared violative of the Equal Protection Clause of the Fourteenth Amendment.

In November 1985 Bannum filed its complaint (*Bannum II*) in federal court seeking temporary and permanent injunctive relief prohibiting the city from interfering with its use of the East Washington Street property as a CTC. Bannum alleged that it was a denial of equal protection for the city to distinguish between the intended use of the East Washington Street property as a CTC, by requiring Bannum to obtain a conditional use permit, while not requiring that similar residential facilities obtain such a permit. The district court granted the motion for a temporary restraining order prohibiting the city from interfering in the occupancy of the East Washington Street property by Bannum's "tenants."

Following a preliminary injunction hearing, the district court granted the city's motion to dismiss on the grounds of abstention, and thereby dissolved the previously entered temporary restraining order. The court noted the ongoing action in the state court in which Bannum's constitutional claims could be resolved, and found that the state court had entered a judgment which would be nullified by granting the relief sought by Bannum. This, the district court found, would constitute an improper interference with the functioning of the state court.

Bannum filed its next complaint (*Bannum III*) in district court in February of 1986. It was predicated, not upon use of the East Washington Street property which had been the subject of *Bannum I* and *II* but, rather, focused on use of the Clay Street property as a CTC. Bannum raised the same constitutional claims previously addressed by the district court, taking is-

sue with the zoning regulations as they existed at the time of the complaint.

In March 1986 Bannum's contract with the Bureau, which had been modified to extend the date for commencement of operations from December 1, 1985, to March 1, 1986, was cancelled because Bannum could not document its conformance with local zoning requirements. The city then moved for dismissal of Bannum's claims on abstention grounds. The court denied the motion and determined that, in light of the Supreme Court's opinion in *City of Cleburne*, Bannum's action was no longer an action from which a federal court should abstain. Thereafter, in the words of the district court, the action lay "essentially dormant" for approximately three years.

While the action lay dormant, the Jefferson County Planning Commission was active. In September 1986 an amended version of the zoning regulations was enacted. The Development Code, as amended by Ordinance No. 308, Series 1986, contained provisions detailing requirements for a special use permit to operate uses termed "exceptional residential uses," and "social rehabilitation residences," within Louisville. In contrast to the failure of the former regulations to define "institution," the current regulations are specific:

EXCEPTIONAL RESIDENTIAL USE: Any premises for which admission to residency in or occupancy of the premises is limited to or intended for persons with a common student status, club membership, religious affiliation, disability, infirmity, physical or emotional illness.

RESIDENCE FOR SOCIAL REHABILITATION: A dwelling unit for two or more persons which are under any supervision of the criminal justice or juvenile justice system, whether such supervision is in the form of imprisonment, or prerelease, or work release or probationary or similar programs.

Article 15(D) of the current regulations applies to CTCs and "exceptional residential uses." According to the regulations, CTCs may not be operated in any zoning district without a conditional use permit. However, "exceptional residential

uses" may be operated in some zoning districts without a conditional use permit.

In March 1988, in anticipation of solicitation by the Bureau for bids on a new CTC contract to take effect upon the expiration of the contract, which Bannum lost to Dismas House in 1986, Bannum applied to the city for certificates of occupancy for both the East Washington Street and Clay Street properties. Relying upon the provisions of the current regulations requiring a conditional use permit to operate a CTC in Louisville, the city denied the applications. In October, Bannum received a solicitation from the Bureau. Bannum sought a preliminary injunction enjoining enforcement of the current regulations pertaining to CTCs. The district court granted the motion, stating:

> We, therefore, hold that the special use ordinance, as applied in this particular case, constitutes a denial of equal protection. It should be noted that the Supreme Court in *Cleburne* did not declare the zoning regulations to be unconstitutional on their face but only as applied. Also, as we noted previously, the City could very well have a legitimate interest in requiring a special use permit of a institution which would house criminals who were on probation or parole but under supervision, and who had a prior record of violent crime.

*Bannum, Inc. v. City of Louisville*, C 86–0165–L(A) (W.D.Ky. Jan. 18, 1989). The trial court found *City of Cleburne* to be controlling precedent, and entered judgment for Bannum. Bannum was awarded damages of $118,552.50 reflecting the income lost as a result of the rescission of the contract between Bannum and the Bureau. In order to review the district court's application of *City of Cleburne*, a study of the Supreme Court's opinion is necessary.

## II.

In *City of Cleburne*, the Supreme Court found a violation of the Equal Protection Clause where the plaintiff, seeking to establish a group home for the mentally retarded in Cleburne, Texas, was informed by the city that a conditional use permit was required. 473 U.S. at 435–36, 105 S.Ct. at 3251–52. The city was of the opinion that the proposed group home was a "hospital for the feeble-minded" under the city's zoning regulation, a type of use not permitted in the zoning district in which the proposed group home was to be located. *Id.* The plaintiff applied for a conditional use permit, was denied, and filed suit alleging that the zoning regulation was constitutionally invalid on its face and as applied. The district court found the regulation constitutionally valid. The Fifth Circuit reversed, finding that the mentally retarded formed a "quasi-suspect" class for purposes of Equal Protection Clause analysis, such that heightened scrutiny should be applied to the justification advanced by the city for its zoning regulation. *Id.* at 437–39, 105 S.Ct. at 3252–53.

The Supreme Court rejected the Fifth Circuit's application of heightened scrutiny, finding the challenged regulations were in the nature of social legislation; and that the court was to apply the most deferential level of scrutiny applied, so that the question presented was whether the regulation was rationally related to a legitimate state interest. *Id.* at 444–45, 105 S.Ct. at 3256–57. The Court found that the regulation failed even this level of scrutiny:

> The constitutional issue is clearly posed. The city does not require a special use permit in an R–3 zone for apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes for convalescents or the aged (other than for the insane or feebleminded or alcoholics or drug addicts), private clubs or fraternal orders, and other specified uses. It does, however, insist on a special permit for the Featherston home, and it does so, as the District Court found, because it would be a facility for the mentally retarded.

*Id.* at 447–48, 105 S.Ct. at 3258.

The Court noted that the city had raised four specific concerns as justifications for the differential treatment afforded the type

of facilities the plaintiff proposed by the regulations: (1) the negative attitude of the majority of property owners located within 200 feet of the facility; (2) that the facility would be located across the street from a junior high school, potentially subjecting residents of the facility to abuse from the students; (3) that the facility was located on a "five hundred year flood plain;" and (4) the size of the home and the number of people who would occupy it. *Id.* at 447–48, 105 S.Ct. at 3258. The Court found these justifications insufficient:

> The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded, including those who would occupy the Featherston facility and who would live under the closely supervised and highly regulated conditions expressly provided for by state and federal law.

*Id.* at 450, 105 S.Ct. at 3260. In finding that the regulations in requiring a conditional use permit of the group home deprived the plaintiff of the equal protection of the laws, the Court noted that such a finding obviated any necessity of determining whether the conditional use permit provision was facially invalid, or, "whether the city may never insist on a special use permit for a home for the mentally retarded in an R–3 zone." *Id.* at 447, 105 S.Ct. at 3258.

### III.

#### A.

The district court's findings, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *See Farber v. Massillon Bd. of Educ.,* 917 F.2d 1391, 1398 (6th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 952, 112 L.Ed.2d 1041 (1991). The city first argues that the factual predicate for the district court's findings under the current and former zoning regulations, that Bannum was treated differently from other similar institutions located in the M–2 Industrial zone, was clearly erroneous. The district court focused upon the different treatment of group home uses in Louisville. It is the similarity of the use, and the zoning regulation's requirement of a conditional use permit for some uses but not for others, that is the subject of constitutional scrutiny. Different treatment is the initial element of an equal protection violation. *Mackenzie v. City of Rockledge,* 920 F.2d 1554, 1559 (11th Cir.1991).

In its ruling, the district court considered the zoning regulations' treatment of CTCs and "exceptional residential uses," and found them to "forbid [CTC's] existence in any zoning district without a conditional use permit," while "[i]n certain zones, the Development Code allows, as a matter of right, exceptional uses which includes, as noted before, centers for the housing, counseling, and supervision of alcoholics, drug addicts and persons with serious or fatal diseases."

Having reviewed the record in this case, we are not left with a "definite and firm conviction that a mistake has been committed." The district court was not clearly erroneous in finding that the city, by application of its zoning regulations, treated Bannum differently from other similar institutions. *Anderson v. Bessemer City,* 470 U.S. 564, 566, 105 S.Ct. 1504, 1507, 84 L.Ed.2d 518 (1985). Ample evidence appears in the record to support the district court's finding of differential treatment under the former and current zoning regulations.

The city's code enforcement officer testified that under current regulations there are zoning districts within Louisville in which boarding houses, hotels/motels, fraternities/sororities, convents/monasteries, and multifamily dwellings for unrelated individuals are permitted as a matter of right, without applying for a conditional use permit. The officer confirmed that current regulations identify no zoning districts in which CTCs may operate without a conditional use permit. The officer also confirmed that various "exceptional residential uses," as defined by the current regulations for uses other than CTCs, could be established in several zoning districts

without the need of a conditional use permit.

A land use planner for the Jefferson County Planning Commission testified that he participated in the development of the current regulations and that the decision to treat CTCs differently was made based upon the perception that CTCs posed a potential threat to the community and exceeded the threat which could be anticipated from other uses. He also stated that the planning commission had been apprised of no hard data supporting the negative perception. Finally, he identified a series of zoning districts in which exceptional residential uses were permitted as a matter of right, and confirmed that a CTC could not be located in any zoning district in Louisville without a conditional use permit.

Testimony also revealed that under former zoning regulations, institutions such as the CTC run by Dismas House, could not operate in any district in Louisville without obtaining a conditional use permit. Under the same regulations, some group home uses could operate in specific zoning districts without a conditional use permit.

In light of the testimony from the city's employees, we find the district court had an ample basis to rule that the zoning regulations accorded different treatment to CTCs and other group home uses. We now turn to the question whether that treatment rises to the level of a violation of Bannum's rights under the Equal Protection Clause.

Historically, the rational relationship level of review is used to determine whether application of a zoning regulation is violative of the equal protection guarantee. Zoning is a quasi-legislative function, and, therefore, zoning decisions are reviewed to determine whether the classifications drawn by the regulations are rationally related to a legitimate interest of the state or municipality. *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *Shelton v. City of College Station*, 780 F.2d 475, 482 (5th Cir.1986) (en banc), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986). Rational relationship review is highly def-

erential. The Supreme Court has recognized that where social or economic regulation is at issue, the Equal Protection Clause allows wide latitude to states, and that "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. However, the Court's rational relationship review in *City of Cleburne*, has been termed an "exacting" rational relationship standard, in that the Court, finding the regulations at issue unconstitutional as applied, held that the desire to impede a politically unpopular group is not a legitimate state interest. *Id.* at 446–47, 105 S.Ct. at 3257–58; *Jacobs, Visconsi & Jacobs v. City of Lawrence*, 927 F.2d 1111, 1119 n. 6 (10th Cir.1991). As the district court was not clearly erroneous in determining that Louisville's former and current zoning regulations impose differing requirements on those who would operate CTCs as opposed to other similar group home uses, the question we face is whether that different treatment as applied to Bannum is a rational means to accomplish a legitimate end. The Court, in *City of Cleburne*, reviewed each justification advanced by the city for its different treatment of group homes for the mentally retarded, and found them inadequate to establish a rational relationship. By the same process we reach the same conclusion.

The city presented one major justification for the different treatment of CTCs; that the occupants of a CTC are more likely to commit crimes than a person never having been convicted of a crime; and, therefore; CTCs present a danger, or at least a perceived danger, to the community in which they operate. The district court was not clearly erroneous in holding that the city had not shown that CTC occupants are more likely to commit crimes than the residents of the community in which a CTC is located. The city's expert witness found that literature on the topic was inconclusive. The city was able to present the district court with no evidence supporting its contention that CTCs present a danger to the community. If the city's goal was to

protect its residents from recidivists,[3] then some data reflecting the extent of the danger must exist in order to render the different treatment of CTCs rationally related to that goal. The rational relationship standard is not met when the classification relied upon by the legislative authority is "so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3258 (citing *Zobel v. Williams*, 457 U.S. 55, 61–63, 102 S.Ct. 2309, 2313–14, 72 L.Ed.2d 672 (1982); *United States Dept. of Agric. v. Moreno*, 413 U.S. 528, 535, 93 S.Ct. 2821, 2826, 37 L.Ed.2d 782 (1973)).

The lack of data supporting the city's contention that the incidence of crime is inflated in areas containing CTCs, and the evidence in the record of substantial community opposition to Bannum's proposed CTC, indicates that the purpose behind different treatment of CTCs by the current zoning regulations is to assure residents of the East Washington Street area that they would not find themselves with a CTC as a neighbor. Were this the basis for the different treatment, the Court in *City of Cleburne* spoke directly to the invalidity of such a justification:

> [M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like. It is plain that the electorate as a whole, whether by referendum or otherwise, could not order city action violative of the Equal Protection Clause, and the city may not avoid the strictures of that Clause by deferring to the wishes or objections of some fraction of the body politic.

473 U.S. at 448, 105 S.Ct. at 3259 (citations omitted).

The city contends that the decision to impose the conditional use permit requirement upon CTCs was based on more than fear. The city asserts that it considered: (1) protection of program residents; (2) prevention of over concentration; (3) public transportation; (4) parking; (5) strain on public safety services; and (6) proximity to hospitals, churches and other public services. The record reveals no indication that these concerns were founded on fact, nor is any reason advanced explaining why a CTC implies these concerns to such an extent that a conditional use permit requirement is reasonable, while other similar group home uses do not.

Because the city's regulation requiring a conditional use permit for operation of a CTC, when it does not so require for other "exceptional residential uses," does not satisfy the exacting rational relationship standard found in *City of Cleburne*, we conclude that the district court did not clearly err in finding that Bannum was deprived of the equal protection of the laws. It is important to note that, as in *City of Cleburne*, the challenged regulation need not be found to be facially invalid, but is only invalid as applied to this plaintiff. 473 U.S. at 447, 105 S.Ct. at 3258. As the district court recognized in its January 1989 ruling, the city may well have a legitimate interest in requiring a conditional use permit of an institution housing those with a prior record of violent felony offenses. We do not hold that the city may never require a conditional use permit for group home uses. However, where no rational relationship to a legitimate state interest is presented justifying the different treatment accorded to Bannum under the zoning regulations, injunctive relief is the appropriate remedy against the unconstitutional application of the regulations to Bannum's property. *Eide v. Sarasota County*, 908 F.2d 716, 723 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1073, 112 L.Ed.2d 1179 (1991).

### B.

■ The city asserts that because Bannum did not apply for a conditional use permit it had not satisfied the requirement of finality, and it should not be permitted to litigate the constitutional issue of equal

---

**3.** It is important to note that CTCs operated by the Bureau do not house felons convicted of crimes of violence involving firearms, or sexual offenders.

protection. The city claims that the trial court confused the requirements of finality and exhaustion of remedies. Bannum, on the other hand, contends that the city's actions at the date of the institution of the action, and subsequent thereto, clearly established the city's position and that the case was final for constitutional litigation.

The trial court, applying *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), found Bannum's equal protection claim ripe for adjudication. The *Patsy* Court reaffirmed that exhaustion of state administrative remedies is not a prerequisite for presentation of a claim pursuant to 42 U.S.C. § 1983. *Id.* at 500, 102 S.Ct. at 2559. The district court also addressed the city's reliance on *Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). The district court's application of *Patsy* and *Williamson* constitutes questions of law which we review *de novo*. *Neighborhood Ass'n v. Planning & Zoning Comm'n*, 896 F.2d 1264, 1266 (11th Cir.1989).

The *Williamson* Court addressed a claim of taking property without just compensation in violation of the Fifth Amendment, and, in finding a lack of finality, explained the distinction between exhaustion and finality:

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definite position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. *Patsy* concerned the latter, not the former.

*Williamson*, 473 U.S. at 193, 105 S.Ct. at 3120; *see also Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir.1989). The Seventh and Ninth Circuits have held that the finality analysis applied in *Williamson* is equally applicable to equal protection claims. *Unity Ventures v. Lake County*, 841 F.2d 770, 775 (7th Cir.), *cert. denied*, 488 U.S. 891, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988); *Herrington v. County of Sonoma*, 834 F.2d 1488, 1494 (9th Cir.1987), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989). This court has held that cases involving procedural due process violations may be ripe for judicial review prior to a final determination. *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890, 895 (6th Cir.1991).

In *Nasierowski*, this court reversed the district court's holding that Nasierowski's procedural due process claim was not ripe for adjudication because Nasierowski had failed, like Bannum, to apply for a variance from a zoning regulation adopted subsequent to Nasierowski's purchase of property, which regulation forbade Nasierowski's intended development scheme. *Id.* at 893. The district court relied upon *Williamson's* command of finality. *Id.* This court found such reliance inappropriate, drawing a distinction between the substantive *taking* claim at issue in *Williamson* and the *procedural due process* claim advanced by *Nasierowski. Id.* at 893–94.

The case before us is not a *taking* case under the Fifth or Fourteenth Amendments, but is a claim that the procedures mandated by the city's zoning regulations deny Bannum the equal protection of the law. It is apparent that the regulations challenged by Bannum define procedures which must be undertaken prior to using property within the city as a CTC, rather than defining the time when court action is proper. What is needed before litigation can proceed in a case such as this is that proceedings have reached some sort of an impasse and the position of the parties has been defined. We do not want to encourage litigation that is likely to be solved by further administrative action and we do not want to put barriers to litigation in front of litigants when it is obvious that the process down the administrative road would be a waste of time and money. We believe that finality, not the requirement of exhaustion of remedies, is the appropriate determinant of when litigation may begin. By finality we mean that the actions of the city were such that further administrative action by

Bannum would not be productive. This test, of course, can be met by the exhaustion of remedies. It can also be met by other evidence and can be satisfied prior to compliance with all the required procedures. This analysis suggests that *Williamson* does not require a finding of lack of finality in this case.

The "futility exception" to the threshold requirement of finality developed by the Ninth Circuit is but another way of articulating the analysis explained above. The exception, stated in the context of allegations of "takings" of property without just compensation as proscribed by the Fifth Amendment, applies where to seek a variance from a zoning regulation would be an "idle and futile act." *See Martino v. Santa Clara Valley Water Dist.*, 703 F.2d 1141, 1146 n. 2 (9th Cir.), *cert. denied*, 464 U.S. 847, 104 S.Ct. 151, 78 L.Ed.2d 141 (1983) (citing *Dahl v. City of Palo Alto*, 372 F.Supp. 647 (N.D.Cal.1974)). For the exception to be available to an aggrieved landowner, the landowner must have submitted at least one "meaningful application" for a variance from the challenged zoning regulations. *Kinzli v. City of Santa Cruz*, 818 F.2d 1449, 1454–55 (9th Cir. 1987), *cert. denied*, 484 U.S. 1043, 108 S.Ct. 775, 98 L.Ed.2d 861 (1988). *See also MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 352–53 n. 8, 106 S.Ct. 2561, 2568 n. 8, 91 L.Ed.2d 285 (1986). In these cases "futility" is tantamount to the requirement of finality.

Based on the previous adjudications of this dispute, there is no doubt that the city had reached a final determination of Bannum's property. We note that Bannum filed affidavits with the Board of Zoning Adjustments seeking to establish a nonconforming use variance for the East Washington Street property. The action by Bannum distinguishes the instant case from those relied upon by the City,[4] wherein this court ordered dismissal for want of finality because the parties opposing zoning regulations failed to seek variances. Following the submission of affidavits,

Bannum was informed that its proposed "boarding house" use was considered an "institution" by the city, and that a nonconforming use variance was not forthcoming. We believe that this constitutes a "meaningful application" for purposes of the futility exception to the requirement of finality.

Having determined that Bannum's proposed CTC constituted an "institution" under the former regulations, the city made a concerted effort in *Bannum I* to prevent Bannum from ever applying for a conditional use permit to operate a CTC in Louisville. Although the city's counsel contended at oral argument that this effort was made in the context of a suit based upon a restrictive covenant within the deed to Bannum's East Washington Street property, this contention does not diminish the fact that the city continuously demonstrated adamant opposition to Bannum's proposed CTC, and proceeded to construe its existing zoning regulations to require that Bannum obtain a conditional use permit. The city's opposition to the proposed CTC is shown by the record to be pervasive. From the record it is not unreasonable for the court to find that the opposition to this special use was such that further proceedings would not have been productive.

Although the current regulations do permit operation of CTCs as well as hospitals, institutions, and nursing homes in M–2 zones, upon issuance of a conditional use permit, this does not remove from the record the city's continuous efforts to prevent Bannum's operation of a CTC. Throughout the trial and this appeal, the city vociferously argues that it presented evidence to the trial court demonstrating that it has a rational basis for restricting the location of CTCs within Louisville and preventing their operation at the described locations. The trial court did not clearly err in finding the case ripe for adjudication and in finding under *City of Cleburne* that the city's primary motivation in restricting Bannum's efforts to establish a CTC was founded upon fear or negative attitudes

---

**4.** The City cites an unpublished per curiam opinion, *Weaver v. Anderson County Fiscal* *Court*, 648 F.Supp. 1575 (E.D.Ky.1986), *rev'd*, 838 F.2d 1216 (6th Cir.1988).

"unsubstantiated by factors which are properly cognizable in a zoning proceeding." *City of Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3258. Regardless of the adoption of the current regulations, it is apparent to us that the court was not in error in determining from the evidence that the city was without a rational basis for its different treatment of similar group home uses, and that the absence of rational justifications is indicative of a firm and final decision to deny any effort on Bannum's part to establish a CTC. The trial court has made no erroneous factual findings and we conclude that the action was final for adjudication, and that further action at the administrative level would simply have delayed the presentation of the matter to the courts and would have been futile.

### IV.

█ Lastly, the city argues that the district court erred in awarding damages to Bannum because Bannum failed to prove a causal connection between any determination made by the city under the former zoning regulations and any damages that Bannum sustained. It was not, the city contends, application of the zoning regulations that caused Bannum to fail to satisfy a prerequisite for confirmation of its contract with the Bureau but, rather, it was the ruling of the Jefferson County Circuit Court, that the proposed use of the East Washington Street property as a group home, was contrary to the restrictive covenant within the deed to the property that led to Bannum's inability to meet the Bureau's requirement. Therefore, if Bannum suffered any monetary loss by the rescission of the 1985 contract, that loss was caused by Bannum's attempt to improperly use its property, not by application of the zoning regulations.

This argument is not persuasive. Although the city brought its complaint in *Bannum I* in reliance upon the restrictive covenant in the deed to Bannum's East Washington Street property, it was the city's argument that the zoning regulations, not the restrictive covenant, precluded Bannum from operating a CTC under any group dwelling home classification cognized by the zoning regulations. The state court recognized that while Bannum was bound by the restrictive covenant as to the East Washington Street property, that property was not the only one owned by Bannum and considered for use as a CTC. However, the city would not allow Bannum to operate a CTC on Clay Street without obtaining a conditional use permit. The cause of the rescission of Bannum's contract was Bannum's inability to demonstrate compliance with the city's zoning regulations, an inability directly related to the city's refusal to allow the CTC to operate without first obtaining a conditional use permit. A causal relationship between the city's policy and Bannum's loss was established, and the trial court did not err in awarding damages.

AFFIRMED.

DAVID A. NELSON, Circuit Judge, dissenting.

The plaintiff never applied for a conditional use permit. The threshold issue, therefore, is whether the plaintiff's claim is ripe for adjudication. On the facts of this case, it seems to me, the logic of *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), compels the conclusion that the claim is not ripe and that it ought to have been dismissed on that ground.

*Williamson* involved a situation where a landowner and its predecessor in title had made extensive efforts to secure permission from local zoning authorities to develop a residential subdivision. A proposed plat of the subdivision was eventually disapproved by a regional planning commission for the reason, among others, that the plat did not comply with the applicable zoning regulations. Without seeking variances (which the commission had the power to grant and which, if granted, would have resolved a majority of the commission's objections to the plat), the landowner brought a lawsuit under 42 U.S.C. § 1983 alleging that its property had been taken

without just compensation. The Supreme Court held that the suit was premature:

"Because respondent has not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation, respondent's claim is not ripe." *Id.* at 186, 105 S.Ct. at 3116.

Citing *Patsy v. Florida Bd. of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982)—the decision on which the district court relied in the case at bar—the respondent landowner argued, in *Williamson,* that it did not have to seek variances because exhaustion of administrative remedies is not a prerequisite to the bringing of a § 1983 action. In response to this argument the Supreme Court pointed out that "[t]he question whether administrative remedies must be exhausted is conceptually distinct ... from the question whether an administrative action must be final before it is judicially reviewable." *Williamson,* 473 U.S. at 192, 105 S.Ct. at 3119. In no way does *Patsy* suggest that administrative action is judicially reviewable before it has become final—before "the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury...." *Williamson,* 473 U.S. at 193, 105 S.Ct. at 3120.

Resort to the procedures for obtaining variances, the *Williamson* Court went on to observe, "would result in a *conclusive* determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed." *Id.* (emphasis supplied). Mere disapproval of the plat was not enough: "the Commission's denial of approval does not *conclusively* determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision." *Id.* at 194, 105 S.Ct. at 3120 (emphasis supplied).

The finality requirement—the requirement that the administrative agency responsible for deciding such matters make a "conclusive" determination that the land may not be used in the desired manner—is no less applicable to equal protection claims than it is to claims based on the takings clause. See, *e.g., Landmark Land Co. of Oklahoma, Inc. v. Buchanan,* 874 F.2d 717, 722 (10th Cir.1989), and *Harris v. County of Riverside,* 904 F.2d 497, 500 (9th Cir.1990), both of which were cited with evident approval by this court in *Nasierowski Bros. Investment Co. v. City of Sterling Hgts.,* 949 F.2d 890 (6th Cir.1991). (Although *Nasierowski* held that the finality requirement does not apply to certain types of due process claims, no such claim is before us here.) There is "no doubt," according to the Ninth Circuit, "that equal protection claims and substantive due process claims are to be analyzed for ripeness in the same way that regulatory taking claims are analyzed: '[T]he [landowners'] equal protection claim is not ripe for consideration by the district court "until planning authorities and state review entities make a final determination on the status of the property." ' " *Shelter Creek Development Corp. v. City of Oxnard,* 838 F.2d 375, 379 (9th Cir.), *cert. denied,* 488 U.S. 851, 109 S.Ct. 134, 102 L.Ed.2d 106 (1988), quoting *Norco Construction, Inc. v. King County,* 801 F.2d 1143, 1145 (9th Cir.1986), as quoted in *Kinzli v. City of Santa Cruz,* 818 F.2d 1449, 1455–56 (9th Cir.1987).

There is nothing to the contrary in *City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), an equal protection case decided only three days after *Williamson.* Like plaintiff Bannum in the case at bar, the plaintiff in *Cleburne* was told that a special use permit would be required for the operation of a group home; unlike plaintiff Bannum, however, the *Cleburne* plaintiff saw fit to submit a permit application. *Cleburne,* 473 U.S. at 436, 105 S.Ct. at 3252. After a public hearing, the permit was denied by a vote of 3 to 1. *Id.* at 437, 105 S.Ct. at 3252. Only after the permit had been denied did the plaintiff file suit—and it was the denial of the permit on which the Supreme Court focused in the very first sentence of its opinion. ("A Texas city denied a special use permit for the operation of a group home for the mentally

retarded, acting pursuant to a municipal zoning ordinance requiring permits for such homes." *Id.* at 435, 105 S.Ct. at 3251.)

The *Cleburne* Court emphasized that if there was a denial of equal protection "in the circumstances here"—*i.e.,* where the plaintiff had actually applied for a special use permit and been turned down—there would be "no occasion to decide whether the special use permit provision is facially invalid...." 473 U.S. at 447, 105 S.Ct. at 3258. The Court noted that the preferred course would be to refrain from deciding the constitutionality of the ordinance on its face, thus avoiding the risk of "making unnecessarily broad constitutional judgments." *Id.*

It was precisely the risk of making "unnecessarily broad constitutional judgments" that plaintiff Bannum invited the courts to assume in the case at bar when the company elected to file suit without having applied for a permit that might have allowed it to operate a community training center at a location and in a manner acceptable to all concerned. *Williamson,* in my view, teaches that such invitations ought to be declined.

The present case would have come to us in a different posture, of course, had the district court expressly found that it would have been futile for Bannum to apply for a permit. The district court made no direct finding on futility, however, and I can see nothing in the record to justify our determining that submission of a permit application would have been futile. The support claimed for such a finding strikes me as highly problematic.

As far as I can tell, Bannum never sought a non-conforming use variance with respect to the East Washington Street property, the location at which the Dismas halfway house was operated until 1985. Mr. David Lowry, the director of Dismas House, did indicate that he or his counsel submitted three affidavits to the City of Louisville's Department of Licenses, Permits and Inspections in an effort to establish a non-conforming use for Bannum's Clay Street property. (It was the Clay Street property where Bannum's administrative offices were located; there was no halfway house there.)

The City's response to this submission, contained in a letter dated January 15, 1986, stated that the claim for nonconforming use status "must be heard by the Board of Zoning Adjustments and cannot be administratively decided by the City of Louisville Department of Licenses, Permits and Inspections." The letter went on to say that the Board of Zoning Adjustment would have to issue a conditional use permit: "In reviewing this matter with Mr. Alex Talbott, the attorney for the Jefferson County Planning Commission and Board of Zoning Adjustment, I learned that it was his opinion that the proposed use to which your client plans to put the Clay Street property is properly categorized as an institutional use and that a conditional use permit will be required for such use in an M–2 zoning district and in any zoning district in the city."

Bannum was thus told in so many words that "a conditional use permit will be required." Although Bannum admits that it could have applied for such permit, it never did so. There was no permit application at all, "meaningful" or otherwise. And there was certainly no conclusive determination that a permit would not be issued.

If Bannum had submitted a properly documented permit application, the company would have been entitled to a public hearing before the Louisville and Jefferson County Board of Zoning Adjustment. City officials and residents of whatever neighborhood Bannum ultimately selected as a proposed site [1] would have had an opportunity to testify in opposition to the granting of a permit, and perhaps they would have done so. I am not prepared to say, however, that the Board of Zoning Adjustment

---

**1.** Bannum was not wedded to either the East Washington Street property or the Clay Street property. Mr. Lowry testified that if he had been told that there was some zoning district other than an M–2 district in which the proposed facility could be located without a permit, he would have made an effort to move there.

would necessarily have denied Bannum a permit regardless of what location was proposed and regardless of what justification Bannum offered for that location. Neither am I prepared to say, where group housing for convicted felons is concerned, that the Equal Protection Clause is violated by the mere requirement for filing an application for a conditional use permit.