**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0479n.06**
**Filed: July 5, 2007**

**No. 06-3389**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JENNIFER LOTHES, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| BUTLER COUNTY JUVENILE | ) | |
| REHABILITATION CENTER, | ) | |
| | ) | |
| Defendant-Appellee. | | |

Before: SUHRHEINRICH, GIBBONS, and COOK, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. Plaintiff-appellant Jennifer Lothes was

adjudicated to be a delinquent child for committing a felony burglary while still a minor. She was

sentenced to not less than six months at an Ohio Department of Youth Services ("DYS") facility for

juveniles. Lothes claims she was denied admittance to a local community corrections facility

("CCF") on the basis of her sex. Lothes brings this action pursuant to 42 U.S.C. § 1983, claiming

violation of the Equal Protection Clause of the Fourteenth Amendment and Title IX of the Education

Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX"). For the following reasons, we affirm the

district court's grant of summary judgment in favor of the defendants as to both claims.

I.

Lothes, while still a minor, broke into and burglarized her parents' home. Her parents

pressed charges, and in May 2004, Lothes was adjudicated by the Butler County Juvenile Court to

be a delinquent child for committing the adult offense of felony burglary. Defendant Butler County Juvenile Rehabilitation Center ("BCJRC" or "the Center") is a multi-county CCF for juvenile delinquents organized under Ohio Rev. Code § 5139.36 and Ohio Admin. Code §§ 5139-61, 5139-63 and established by an agreement between the Ohio DYS and Butler, Clermont, Clinton, and Warren Counties. The statutory purpose of a CCF such as the BCJRC is to reduce "the number of felony delinquents committed to the department from the county or counties associated with the community corrections facility." Ohio Rev. Code § 5139.36(B)(1)(a). Defendant Thomas W. Barnes is the superintendent of the BCJRC and in charge of its operation, including the enforcement of its eligibility criteria. Defendant Butler County is a signatory to the Multi-County Agreement that established the BCJRC. In that agreement, Butler County agreed to operate and manage the BCJRC for the use of all member counties. Ohio's delinquent children not confined locally in CCFs like the BCJRC are housed in DYS-operated facilities.

The BCJRC opened in 1992 and is generally considered a success.[1] The BCJRC was originally a 46-bed facility for males, consisting of three ten-bed units, one six-bed unit, and a separate ten-bed halfway house. The BCJRC began accepting female offenders in 1996 in an effort to meet its goal of maintaining the 90 percent occupancy rate necessary to retain full funding for the institution. The BCJRC subsequently opened a six-bed unit (representing 13 percent of the total bed spaces) as its female unit. The operation of the six-bed female unit required at least four female youth leaders and a primary therapist or case manager specifically for that unit; staffing represented

---

[1]Evidence suggested that in 1999 the BCJRC was among the two highest-rated CCFs in Ohio and that its graduates had less recidivism than youths who completed the lowest-rated programs.

2

the most significant expense of operating the female unit.

The BCJRC experienced a steadily decreasing number of female-offender referrals in the years preceding the elimination of the female facility in 2003. In Fiscal Year 2002 (ending on June 30, 2002), the BCJRC's average daily population was 36 juveniles, leaving an average of 10 beds unoccupied. A total of six females, or 7 percent of the total population, were admitted to the facility in FY 2002. In that year, the Ohio DYS informed the BCJRC that its funding would be cut.[2] In 2002, pursuant to budget cuts resulting from its failure to maintain the required 90 percent occupancy rate, the BCJRC eliminated the ten-bed halfway house, reducing the total facility capacity to 36 beds. Even after eliminating these beds, the Center was unable to meet the 90 percent occupancy requirement.

The Ohio DYS announced a second round of budget cuts in February 2003. The announced cut was to be 5 percent of the BCJRC's annual budget, or roughly $77,000.[3] At the time of the notification of the imminent budget cut, the BCJRC female unit had only two of its six beds occupied, and those two females were preparing to leave. After considering the available options, the BCJRC made a decision, with the consent of the referring juvenile courts and the Ohio DYS, to close the BCJRC female unit, effective February 1, 2003.

---

[2]The DYS informed the BCJRC that if the Center did not maintain 90 percent occupancy, the Center's funding would be cut in proportion to the amount that its occupancy fell short of this threshold. Because the BCJRC had 46 beds at this point, the Center had to maintain an average occupancy of 42 juveniles to retain full funding. For every resident short of this number, the Center would lose approximately $28,000 to $30,000.

[3]The State's payments to CCFs like the BCJRC were based on a quarterly schedule, and as a result, the entire budget cut would come out of the fourth quarter of the year and constitute 30 percent of the funding for that quarter.

3

Lothes was sentenced in May 2004, well after the BCJRC stopped accepting females. Lothes was ultimately committed to the DYS for a minimum term of six months and a maximum term not to extend beyond her twenty-first birthday. Lothes was assigned to the DYS Scioto Correctional Facility for Juveniles ("Scioto") for a period of six months and then transferred to the Freedom Center, a drug rehabilitation center, for a period of three months. She served approximately eleven months and was released.

While at Scioto, Lothes attended school and participated in group therapy. She testified that she benefitted from the education and counseling she received at Scioto and did not report any negative experiences that hampered her well-being, development, or education. Lothes's mother, Sara Lopez, does not cite any specific programs or services that Lothes would have enjoyed had she been placed at the BCJRC instead of Scioto. Rather, Lopez asserts that a local placement (such as the BCJRC) would have made participation in family therapy during her daughter's incarceration more convenient.[4]

Lothes contends that she was denied the services afforded to similarly situated males and this treatment violated Title IX and the Equal Protection Clause of the Fourteenth Amendment. After filing suit in federal district court, Lothes's case was referred to a magistrate judge for disposition

[4]Ohio state law specifically provides for out-of-county placements for juveniles to other counties' CCFs. Ohio Rev. Code § 5139.36(E)(3). Gary Neidenthal, the Superintendent of Corrections for Green County Juvenile Court and manager of the Miami Valley Community Corrections Facility ("Miami Valley"), provided in his affidavit that Miami Valley accepted juvenile girls during 2003 and 2004 and "was ready, willing, and able to accept referrals for female juvenile offenders from other counties, including Butler County, Ohio." Miami Valley offered the same programs of counseling and treatment offered at the BCJRC. Both Lothes's attorney and her sentencing judge were apparently unaware of the availability of placements at Miami Valley.

4

by consent of the parties. The magistrate judge concluded that Lothes had failed to meet her burden of showing that she had been denied educational programs or activities on the basis of her sex in violation of Title IX. Specifically, the magistrate judge found that Lothes did not establish that female residents of the DYS are afforded educational and counseling opportunities unequal to those of their male counterparts who are housed in CCFs or elsewhere. With regard to Lothes's equal protection claim, the magistrate judge found that "because [Lothes] had available to her a rehabilitation program that was substantially equal to that offered at the Butler County Juvenile Rehabilitation Center, she has failed to show disparate treatment in this case." The magistrate judge concluded that because Lothes failed to show disparate treatment, the court need not determine whether the elimination of the female unit at the BCJRC was substantially related to an important governmental objective.

## II.

This case involves an appeal from the district court's grant of summary judgment to the defendants. On appeal, we apply a clearly erroneous standard of review to the district court's findings of fact and a *de novo* standard to its conclusions of law. *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 680 (6th Cir. 2006).

## III.

## A.

Lothes asserts that the BCJRC violated Title IX by adopting a policy that excludes females from its programs. Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education *program or activity* receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). Lothes contends she was denied admission to, and a reasonable and equal opportunity to participate in, the BCJRC. The magistrate judge found that the BCJRC was not in and of itself a "program or activity" within the meaning of Title IX but instead "it is one of several community corrections facilities within the ambit of the Department of Youth Services. For purposes of Title IX, the 'program or activity' is the entire system of juvenile institutions operated by the Ohio DYS." Lothes asserts that the BCJRC is a distinct unit for purposes of the Title IX analysis, and as such, it is "a single, covered entity that itself is prohibited from discrimination." Under the definition proposed by Lothes, her "educational opportunities must be compared with the opportunities for boys at the BCJRC."

"Program or activity" is defined under Title IX as follows:

> For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of —
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
> . . .
> any part of which is extended Federal financial assistance[.]

20 U.S.C. § 1687.

Lothes offers no relevant authority supporting her narrow interpretation of "program or activity."[5] To the contrary, we find that the language of Title IX and the logistical reality of

---

[5]Lothes contends that the BCJRC is a "local political subdivision" that is distinct from the DYS. This argument is unavailing. The term "local political subdivision" is Lothes's own,

administering a prison system support the district court's finding that the BCJRC is only one of multiple community correction facilities within the overall ambit of the DYS. *See Klinger v. Dep't of Corr.*, 107 F.3d 609, 616 (8th Cir. 1997) (finding that Title IX requires comparison of opportunities for male and female prisoners within the entire state correctional system). We agree with the Eighth Circuit that an individual correctional facility is not a "program or activity" within the meaning of 20 U.S.C. § 1687. *Id.* at 615. Instead, the only logical and workable application of § 1687's definition of "program or activity" requires consideration of the opportunities afforded to male and female prisoners within the entire system of institutions operated by a state's federally-funded correctional department, "taking into account the objective differences between the male and female prison populations and such penological and security considerations as are necessary to accommodate in this unique context." *Id.* at 615-16. Accordingly, for purposes of Title IX, the "program or activity" here at issue includes the entire system of juvenile institutions operated by the Ohio DYS.

## B.

Having determined that the appropriate scope of analysis includes the entire Ohio system of juvenile institutions, we must compare the educational opportunities afforded to females and males

---

drawn from Ohio law, and does not appear in Title IX. Lothes cites only *Floyd v. Waiters*, 133 F.3d 786, 791 (11th Cir. 1998), a case later vacated by the Supreme Court, for the proposition that state law defines the scope of the covered entity for purposes of Title IX. In *Floyd*, the Eleventh Circuit was interpreting 20 U.S.C. § 1687(1)(B), which in *Floyd* concerned educational institutions, while the case before this court focuses on § 1687(1)(A), which here concerns prisons. *See Floyd*, 133 F.3d at 790-91. This distinction is significant in light of the unique treatment of prisons in the Title IX context. *See, e.g.*, *Jeldness v. Pearce*, 30 F.3d 1220, 1228 (9th Cir. 1994) ("Prisons are different from other institutions to which Title IX applies. Security is an important concern. And sex segregation is the accepted norm.").

throughout the DYS, including those at the CCFs. Title IX does not mandate a "[s]trict one-for-one identity" of available opportunities but does require that men and women have an equal opportunity to participate in comparable programs. *See Jeldness*, 30 F.3d at 1229.

This court has never directly addressed this particular question, and we therefore consider our sister circuits' treatment of the issue. In *Jeldness*, a case cited extensively by both parties, the Ninth Circuit considered a class of female prisoners' claim that the Oregon State Department of Corrections discriminated against female inmates in providing educational and vocational opportunities. *Id.* at 1224-30. After noting the unique challenges a state faces in administering a prison system, the *Jeldness* court explained what was required by Title IX in the prison context:

> If an education program takes place in the prison, exclusion of women from a particular class solely because women do not reside at the prison offering that class is not improperly segregating "separately on the basis of sex," but it is rather an activity [sic] "separately on the basis of location." The prohibited activity would be the offering of educational programs only in the men's prisons, without offering equivalent programs in the women's prisons. In that case, women would be "denied the benefits of a program" on account of sex.

*Id.* at 1229.

In her deposition, Lothes did not identify adverse treatment of any sort while at Scioto. During her stay she went to school and participated in group therapy. Lothes received drug counseling as well during her time at Scioto, and she reported that she benefitted from the counseling. Lothes also attended a separate drug rehabilitation facility (the Freedom Center) for part of her incarceration. When asked if she was aware of any opportunities available to residents at the BCJRC that were not available to residents at the Scioto facility, the only difference Lothes could

identify was that juveniles at the BCJRC were permitted to keep a journal.[6]

Sara Lopez, Lothes's mother, also stated that nothing happened to Lothes while at Scioto that was of concern to her. Lopez said there was nothing specific that would have been available to her daughter at the BCJRC that was not available at Scioto. Instead, Lopez testified that a local placement would have more easily enabled her family to engage in family therapy during her daughter's incarceration, rather than waiting until Lothes's release. Family therapy was available at the Scioto facility, but it apparently was not feasible for Lopez to drive more than an hour to attend family therapy sessions. Such geographic hardships alone, however, do not violate Title IX. *Cf. Jeldness*, 30 F.3d at 1229 ("If an education program takes place in the prison, exclusion of women from a particular class solely because women do not reside at the prison offering that class is not improperly segregating 'separately on the basis of sex,' but it is rather an activity 'separately on the basis of location.'")

Finally, Lothes contends that the BCJRC failed to "satisf[y] its Title IX burden to afford Lothes a reasonable opportunity to attend the Miami Valley CCF." This assertion—that there is some affirmative duty on the part of the facility, here the BCJRC, to lead a juvenile defendant to the institution that she believes fits his or her needs—fundamentally misconstrues the purpose of Title IX. Under Title IX, women must have an equal *opportunity* to participate in programs of comparable quality, *see Jeldness*, 30 F.3d at 1229, but Lothes provides no case law to support the notion that under Title IX it is incumbent upon a facility or a court to direct a defendant to the particular facility

---

[6]As the magistrate judge noted, the fact that juveniles placed at the BCJRC may have had less recidivism than those in other CCFs (or even DYS facilities) in 1999 does not imply that educational programs over the entire system are unequal on the basis of sex.

that she believes meets her needs.

For these reasons, we affirm the district court's grant of summary judgment in favor of the BCJRC on Lothes's Title IX claim.

IV.

Lothes also contends that the exclusion of females from the BCJRC violates the Equal Protection Clause of the Fourteenth Amendment. Lothes's sole contention is that a local placement—such as the BCJRC—would have facilitated her participation in family therapy during her incarceration, as opposed to after her release. Lothes does not assert that she was wholly denied family therapy that was available to male inmates but, rather, that attending family therapy would have required her family to drive a substantial distance.

Segregation of inmates by sex is unquestionably constitutional. *See, e.g.*, *Jeldness*, 30 F.3d at 1228 (noting that "sex segregation [in prisons] is the accepted norm"). Moreover, Lothes was not entitled to go to the particular facility of her choice; the Equal Protection Clause ensures only that she is afforded opportunities comparable to those of similarly situated males. *Cf. Sullivan v. City of Cleveland Heights*, 869 F.2d 961, 963 (6th Cir. 1989) (finding that a female plaintiff must first establish that she was accorded treatment unequal to that of her male counterparts in order to proceed with an equal protection claim).

Disparate treatment is an inherent initial requirement of an equal protection violation. *See, e.g.*, *Cmtys. for Equity*, 459 F.3d at 695. Further, "[d]isparate treatment does not arise from any and all differences in treatment; it occurs only where the offending party '*treats some people less favorably* than others because of their race, color, religion, sex, or national origin.'" *Id.* (quoting

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)). Unlike the situation in *Communities for Equity*, where female athletes were systematically given disadvantageous athletic schedules, Lothes was afforded opportunities comparable to those offered to male inmates. The undisputed evidence shows that she received counseling, educational opportunities, and drug rehabilitation services while at the Scioto DYS facility. Her family's personal decision not to drive to Scioto to attend family therapy sessions cannot negate the fact that such therapy was offered. Because Lothes has failed to establish how the services she received at Scioto were deficient in comparison to the programs offered at the BCJRC, her equal protection claim must fail. *See Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1359 (6th Cir. 1992) ("Different treatment is the initial element of an equal protection violation.").

## V.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the defendants on both Lothes's Title IX and equal protection claims.